Mr. Justice CLIFFORD
 

 delivered the opinion of the court.
 

 This ease comes before the court upon a writ of error to the Circuit Court of the United States for the district- of Maryland. It is an action of
 
 indebitatus
 
 assumpsit, and was brought in the court below by the defendants in error, who were the original plaintiffs, to recover the freight earned by the ship Shirley on a charter of the ship made by the plaintiffs to the original defendants for the transportation of guano from the Chincha Islands to the-United States. At the date of the charter-party,' the defendants were the agents of the -Peruvian Government, and, as such, had been for some time in the habit of chartering vessels to bring guano to the United' States for sale. Its. exportation from the islands is a Government monopoly, in which none except those employed by the Government are permitted to engage, and the. defendants are the sole agents of that Government in -the United- States. They reside in Baltimore, and have agents in New York and Boston, duly authorized to negotiate for vessels, and, after the charters are signed by the owners, to transmit them to the defendants for their- approval and signature. Their agents in Boston negotiated the charter of the Shirley, and, after it was executed in behalf of the owners, it was accordingly transmitted and signed
 
 *152
 
 by the defendants. It is dated Boston, April 11, 1854, and recites, among other things, that the Shirley was then lying at New York, and that she was to proceed to Callao, from Australia, where she was then bound, and from thence with all convenient dispatch to the Chincha Islands, to take in her ' cargo of guano. She was to be at Callao ready to load in the course of January and February, 1855, or sooner, and ninety running days were allowed for loading. After completing her loading, she was to proceed direct to Hampton Roads, her place of destination, to receive orders from the defendants or their agents to discharge at any safe port not south of Hampton Roads or north of Cape Ann. Freight was to be paid at the rate of twenty-five dollars per ton, custom-house weight, and the ship was to have the benefit of any advance in the guano freights made by the charterers in the United States before she finished loading at the islands.
 

 She sailed from New York the first of May, 1854, with a full cai’go on owners’ account, which she discharged at Australia, and sailed thence, in pursuance „of her charter, to Callao and the Chincha Islands. Her cargo of guano was loaded between the first day of January and the ninth day of March, 1855, and on the following day she sailed for Callao, and thence to her place of destination for orders. On her arrival at Hampton Roads, she received orders to go- to Baltimore, which she accordingly did, and was there unloaded between the first and the twenty-fifth day of July, 1855, having brought home, fourteen hundred and fifty-nine tons of guano. Sorbe correspondence, however, had taken place between the parties before the Shirley arrived. On the eighth day of June, 1855, the plaintiffs wrote to the defendants, referring to that clause in the charter providing for an advance] and suggesting that they had been induced to make the charter at the solicitation of their agents, upon. the assurance that they should receive every advantage from any rise in freight, and expressing their astonishment at learning that they did not intend to pay more than at the rate of twenty-five dollars per ton, and signifying at the same time their willingness to listen to any fair proposition the defendants had to make. To that letter the defend
 
 *153
 
 ants replied, under date of the eleventh of June, 1855, to the effect that the guano freights had remained at the same rates since the Shirley was chartered, admitting, however, that they' had since taken up certain'vessels with the privilege of using them outwai Is, and saying that they had done so in several instances, and that in such cases they had allowed the vessels a compensation for that use, hut that such additional compensation had nothing to do with the rates of guano, as would appear by referring tó those charters. Other correspondence took place between the parties, or their counsel, which it is not necessary to notice at the present time. After the cargo • of the.Shirley was discharged, the defendants rendered an account of the voyage .to the plaintiffs, showing a balance in their favor of twenty-one thousand nine hundred and forty-three dollars and eighty-nine cents, calculating the freight at twenty-five dollars per ton, without any allowance for a rise under • the advance clause of the charter, which was not satisfactory to the plaintiffs. They claimed a further sum under the advance clause, equal to five dollars per ton upon the whole freight brought home. Seven other vessels were chartered by the defendants between the eleventh day of April and the. twenty-seventh day of May, 1854, for the transportation of guano from the Chincha Islands to theTTnitéd States. All of those charters were introduced by the plaintiffs, subject to objection, and they are substantially the same with that of the Shirley, and' contain a similar clause, giving the vessels the benefit of a subsequent rise in the guano freights. On the first day of June, 1854, after these charters were executed, the defendants wrote to their agents in New York and' Boston, enclosing a
 
 pro f orma
 
 charter-party for vessels out and home, and authorized and instructed them to take up as many vessels as they could under such charters, without allowing the least deviation from its terms, and directing them in the same communications to keep former rates, without benefit.,of’ advance, for home charters. It. recites that the vessel taken up"shall proceed to Callao, from a port in the Indian or Pacific oceans, “where she is at present bound,” and thence with all convenient dispatch to the Chincha Islands to take in her car
 
 *154
 

 go,
 
 and that the vessel shall be ready to load in the course of January, 1855, and shall thence proceed to Hampton Roads for orders and to discharge, as is provided in the charter of the Shirley. Freight was to be paid on charters conforming to those instructions at the rate of twenty-five dollars per ton, custom-house weight, and the charters were to contain the fol-. lowing stipulation:
 

 “It is further agreed, that within one week from the date hereof, the owners of the vessel may, if they see fit, elect to dispatch her direct to Callao and the Chincha Islands, to load, as hereinbefore provided; and in case the owners shall so elect, the charterers shall be entitled to all her earnings for-such outward voyage, and shall further have the privilege of shipping by her such outward cargo, not exceeding two hundred tons, as they may desire, provided they shall do so within ten- days after the owners shall have announced their election. The charterers, on the arrival of the Vessel at the home port, to pay, ■ in full satisfaction for such earnings and privilege, and of all outward freight, such gross sum as shall be equivalent to
 
 five dollars
 
 per ton on the return cargo delivered.”
 

 Twenty-five vessels were subsequently taken up under charter-parties substantially conforming to that stipulation, all bearing. date prior to the thirtieth day of July following that instruction. Sixteen were negotiated by the agents of the defendants residing in New Yoi’k, five by the defendants themselves, and the remaining four by their agents-in Boston. In many of these charters, the clause prescribing the port from which the vessel was to proceed to Callao, as contained in the
 
 fro forma
 
 charter-party, was omitted, and another substituted in its place, as “from where she was bound,” or “from Amsterdam, where bound,” or from New York direct to Callao. These deviations, however, from the form of a charter furnished by the defendants must have been approved by them, as all the charters subsequently negotiated by their agents were duly transmitted to Baltimore, and received their signatures, before they went into operation. Some other deviations from the
 
 pro forma
 
 charter-party, of minor importance, were introduced into one or more of these charters, wl ich it is not im
 
 *155
 
 portant to notice in this investigation, as they all* contained the stipulation above mentioned, which is the principal subject of controversy in this suit. Under that stipulation, the owner might elect, within a week from the date of the charter-party, to dispatch the vessel direct to Callao and the Chincha Islands; and in that event, the charterers had the privilege to ship the outward cargo for their own benefit, not exceeding two hundred tons, provided they elected so to do within ten days after the owner.announced his decision to .send the vessel direct; and in case the owner so elected and sent the vessel, no matter whether the charterers freighted her out or not, the owner was entitled in all events to demand five dollars per ton on the return cargo of guano, in addition to the twenty-five dollars agreed to be paid in the general clause of the charter-party already stated.
 

 "Whether the vessel carried out much or little freight, or none at all, was entirely immaterial to 'the owner, so far as respected the earnings of the vessel, as the additional compensation in any event was to be estimated and ascertained, not upon the outward freight, but Upon the return cargo; and it made no difference in respect to time, as the owner contracted that the vessel, whether freighted or not, should be at Callao ready to load in the course of January, under the penalty of twelve thousand dollars.
 

 That stipulation, whatever might have been its .object, resulted in no material pecuniary advantage to the defendants. They did not furnish any outward cargo, -except in a single instance, and then only to a small amount, consisting of seven or eight boxes of cigars. In another instance, they offered to ship two iron boilers for Callao, but the owners refused to take them as deck load, alleging that it would be dangerous, and the dispute led to a cancellation of the contract by .mutual consent. Except in those two cases, the defendants never attempted to avail themselves of the benefits secured by that provision, either by furnishing the freight directly or by advertising the vessels. Their counsel insist that the additional compensation was paid for the privilege thus secured; and that it makes no difference whether it was exercised or not, inasmuch as they had the right to avail themselves of it if they saw
 
 *156
 
 fit, and found it to be for their advantage. All or nearly all of the vessels proceeded directly from the United States, carrying out no freight for the defendants,' and on their return were paid the additional five dollars for every ton of guano brought home. How much that additional compensation amounted to does not appear, nor are there any data in the record from which it can be definitely ascertained. According to the charter of the Shirley, she was a ship of nine hundred and ten tons burden, and it appears that she brought home fourteen hundred and fifty-nine tons of guano, reckoned at customhouse weight. Eleven of the charters of the other vessels give their tonnage, showing that their measurement, on an average, is a fraction more than eight hundred tons. Assuming that the average of the eleven, whose tonnage is given, is the true average of the whole number chartered containing that provision, and that each brought home cargo in proportion to the Shirley, it would show that the amount of the additional compensation allowed to those vessels under that clause could not have been much less than one hundred and fifty thousand dollars. "Whatever the sum was, whether more or less than the amount supposed, it must be assumed, on the theory of the defendants, that it was allowed and paid by the charterers, in consideration of the privilege secured to load the vessels outward for their own benefit, which privilege the case shows they never exercised to an extent to enable them to realize therefrom more than the sum of fifty dollars. It was insisted by the plaintiffs in .the court below that this stipulation was inserted in those charters', as a device to avoid the, effect of the advanee clause in the charter of the Shirley and other vessels, which had gone out. under similar charters, and that, the real contract was one to give thirty dollars per ton for the transportation of the guano to the United States, and consequently showed that the charterers, within the period specified, had made an advance in the guano freights equal to the amount of' such additional compensation.
 

 They also offered parol proof in support of their view of these transactions, which was received by the court, subject to objection.
 

 
 *157
 
 Such, brief portions only of the testimony as are necessary to a proper understanding'of tlie legal questions to be decided will here be reproduced.
 

 In respect to the vessels whose charters required that they should proceed from some port in the Indian or Pacific'ocean, the plaintiffs proved that the vessels proceeded direct to Callao, and that the owners, at the time the charters were made, did not and had not contemplated any such indirect voyage, and elected, in the act of executing the charters, to send the vessels direct, and, in some instances, were told immediately, by the agents of the defendants, who negotiated the charters, that they might proceed at once, as there was no outward cargo for them. Those charters from which the above clause had been stricken out still contained the stipulation in question, allowing the election to the owners as to the course- of the voyage; and in such cases, the vessels went out in ballast direct to Callao, and on their return from the Chincha Islands with a cargo of guano were paid the additional compensation.
 

 Another class of testimony was to the effect that the agents of the defendants in New York and Boston offered thirty dollars per ton for the charter of the vessels to go .direct, and, after the offers were accepted by the owners, that the charters were drawn up, containing this stipulation; and that the owners, when the charters were presented for execution, inquired why they were so drawn, -and were told that it was because they had made charter-parties at twenty-five dollars per ton, and consequently did-not .wish that these charters should show more than that sum; and in one instance, the answer to the inquiry was, that they did not wish these charters to c mflict with former charter-parties, which .provided for 'a freight of twenty-five dollars per ton,.with the benefit of a rise. These declarations of the agents of the defendants were proved by the owners of the vessels who made the charters. It was proved by .the defendants that their agents never had any authority in respect to such charters, except what was conferred by the letters of instruction of the first of June, 1854; and those agents, upon being called as witnesses, denied that
 
 *158
 
 they had ever made the declarations ascribed to them by the witnesses called by the plaintiffs.
 

 Further explanatory and rebutting testimony was introduced by the defendants; but, as it does not give rise to any legal question for the consideration of the court, it is omitted.
 

 After the testimony was concluded, the counsel of the defendants requested the court to exclude from the consideration of the jury all the declarations and statements of those agents given in evidence by the plaintiffs, respecting the terms, conditions, or purposes, of the charter-parties negotiated by them, varying from the authority and powers conferred on them by their written instructions; which the court refused to do, so far as regarded the declarations and statements made at the time the charters were. executed, and ruled and determined that all such declarations and statements were admissible and competent evidence. To which refusal and ruling the defendants excepted, and their exception was allowed by the court.
 

 Prayers for instruction were then made by both parties— .first by the plaintiffs, and then by the defendants. Those presented by the defendants were made the subject of exception. They are eight in number, including the one embraced in the third bill of exceptions; but inasmuch as we have come to the conclusion that the instructions given by the court cover the whole controversy between the' parties, they will not be specifically examined; and for.the further reason, that their separate consideration would be tedious and unprofitable.
 

 The instructions given by the co'urt are to the effect that, in addition to the balance proved on the account rendered, “ the plaintiffs are entitled to recover such further j3um,if.any, as the jury may find to have'been the advance on the'freights agreed to be paid by the defendants to any one for bringing guano from the Chincha Islands td theJTnited States in char-, ters executed here between the eleventh'day of April, 3.854, and the day the jury shall find, the Shirley .finished loading at the Chincha Islands.
 

 2. “ That in ascertaining whether any contract for advanced freight was made, the jury are not confined to the considera
 
 *159
 
 tion alone of the charter-parties executed after the eleventh, day of April, 1854, but are to consider them in connection with all the evidence in the case; and if they find that the real contract, income one or more of the charter-parties, was a contract to bring guano here and deliver it at thirty'dollars ' per ton, and that the five-d ollar clause was. added to avoid any responsibility under the advance clause in the charter of the Shirley, then the five dollars advance is an advance freight, within the meaning of the first instruction.”
 

 Under these instructions, the jury returned a verdict for the plaintiffs in the sum of thirty thousand nine hundred and forty-four dollars and sixty-two cents. Whereupon, the defendants brought a writ of error to this court.
 

 1.' They now insist, among other things, to the effect that the advance clause in the charter-party of the Shirley must-be interpreted to refer only to homeward voyages from the Chincha Islands to the United States.
 

 2. That the charter-parties introduced by the plaintiffs to show an advance in the guano freights are on their face for voyages of a different character from that of- the Shirley, and afforded no evidence to maintain the action.
 

 8. That' the parol evidence- introduced by .-the plaintiffs was not admissible, and should'have been rejected.
 

 ’ 4.- That even if the parol evidence were admissible, and it-were-competent .to treat the charters under consideration as stipulations for a round voyage out and home, they would still furnish no evidence of an advance in the guano freights over the charter of the Shirley, unless it ivere shown that the earn-. ings of the' Shirley out, and the twenty-five dollars per ton home, were less than the thirty dollars' per ton' stipulated to be paid under that construction of these charters.
 

 I. All of these propositions except one involve, directly or indirectly, the-construction of the'advance clause in the charter of the Shirley. Under that clause, the Shirley was to have the benefit of any advance in the guano freights made by the charterers in the United States, before she finished loading at the islands. She was chartéred on the eleventh day of April, 1854, and finished loading oh the eighth 'day of March, 1855;
 
 *160
 
 and consequently her owners were entitled, by the express words of the contract, to claim the benefit of any advance in such freights made by the defendants in the United States between those dates.
 

 Such an advance in guano freights could only be made by the defendants, as they were the only persons in the United States who were authorized by their Government to contract for its transportation. They could raise the price of transportation or reduce it, if the owners of vessels would accept their terms; and if not, they'could refuse to contract; and if no contracts for -an advance were made • by them within the period specified in the charter of the Shirley, then her owners would have no claim for additional compensation. Their right to such compensation was not referred to the state of the market, but to the subsequent contracts made by .the defendants for the transportation of guano from the Chincha Islands .to the United States. Freights in general might rise ever so much, and it. would not benefit the plaintiffs unless the defendants yielded to its influence, and made contracts to give higher rates for the transportation of guano. - They might engage in any other branch of commerce, and give what rates of freight they pleased, and yet if they did not make any advance in the guano freights in the United States, it would not confer any benefit upon the plaintiffs. Any other advance in freights, however great and by whomsoever made, were not to be taken into account in,. determining the question whether the plaintiffs were entitled to additional compensation. In order to avail the plaintiffs in that behalf, it must be an advance made by the defendants, ■ and one paid, or agreed to be paid, as the price for the transportation of guano to the United States; and it must appear that the contract for such payment was made within the period ■specified in that"clause, of- the charter of the Shirley. Looking, therefore, to the plain impoi’t of the language of the- parties, and applying that language to the subject-matter of the contract, as described in the contract itself, it is clear that the', word “freight,” as qualified by the word “guano,” was used in a special sense, and refers solely to the price paid, or agreed ,to be paid, by the defendants, within .-the prescribed time for ■
 
 *161
 
 the transportation of guano from the Chincha Islands to the United States. According to the terms of the contract, the parties agreed that the subsequent transactions of the defendants in the same trade should furnish and constitute.the standard or criterion by which their rights and duties towards each other growing out of that clause in the charter-party should be ascertained and determined. Their agreement was to the effect- that the plaintiffs contracted unconditionally to perform the service mentioned, for which they were in all events to receive the sum specified in the general clause of the charter-party ; and in case the defendants paid or contracted to pay other persons a greater sum for the like service before the Shirley finished loading, then the plaintiffs wei’e entitled to an additional compensation under this special ’ clause, equal to the excess so paid or contracted to be paid to such other parties. They chartered their vessel early in the season, as appears from the date of the charter-party, and it may fairly be inferred from the nature of the transaction and the surrounding circumstances, independently of the correspondence, that some .such stipulation was regarded as necessary to protect their, interests in the contingency of a rise in freights as the season advanced. Such contingent agreements are of frequent occurrence between merchants and ship-owners, and are entitled to receive a liberal interpretation, as they are- in furtherance of trade and equal justice between the parties. They are, perhaps, more frequently based upon the future state of the - markets, and not, as.in this case, upon the transactions of the merchant in the particular trade. .' Parties, however, have the right to select what criterion they please; and where their contracts are fairly made, they must receive a reasonable construction, so as tó carry their intention into effect, and in general that intention must be gathered from the language employed, the surrounding circumstances, and the subject-matter. Our attention has been drawn to the case of Gether
 
 v.
 
 Capper, (80 Eng. C. L., 695,) as asserting a contrary doctrine. On a careful examination of the facts of that case, and the opinions of the judges, we have come to the. conclusion that it is not opposed to the views here expressed. It was an action for freight
 
 *162
 
 upon a charter-party. Under the general clause, a given rate of freight was to be paid in all events, as in this case; and it contained a special clause, which stipulated that .the plaintiff “was to receive the highest freight which he could prove to have been paid for ships on the same voyage, when the vessel passed Elsinore.” At the trial, the plaintiff was unable to prove that any other vessel had made the voyage referred to in the charter-party. Failing in that attempt, he then offered proof that a higher rate had been paid for vessels about that time from Lundswall, or an adjacent port, to London, which is a very different voyage. Whereupon a vérdict was taken for the plaintiff, reserving leave to the defendant to move to enter • a verdict in his favor, or to reduce the damages, as the court should think fit. A rule to show cause was accordingly granted, and after argument it was made absolute. Separate opinions were given on the occasion by the judge's, to the effect that the owner could not entitle himself to the additional compensation by proving that other vessels had been chartered at higher rates from Lundswall to Londou, that being a different voyage, and not within the fair intendment of the charter-party. Every one of the judges present placed the decision expressly upon the words of the charter-party, and the failure of the plaintiff to bring his ease within their intendment. His right to additional compensation was made to depend, by the express words of the contract, upon his being able to prove that other vessels at the time specified received or were to receive higher rates of freight for the same voyage. He failed to exhibit the proof, and, of course, was not entitled to recover. ■ His contract prescribed the criterion by whieh his claim to additional compensation was to be ascertained^ and determined, and he had no right to go out of the contract and select a new standard, to which the other contracting party had not consented. It is .far otherwise with the plaintiffs in the case under consideration. Their case rests upon somewhat different grounds. They have proved the state, of faets on which their right to recover depends. According to the verdict of the jury, and the instructions- of the court, their case is brought within the legal intendment of the contract, leaving nothing for the considera-
 
 *163
 

 '
 
 tion of this court, except, the legal questions presented in the bills of exception. Their ship was to have the benefit of any' advance in the guano freight, made by the charterers in the United States before she finished loading. They contracted to bring guano from the Chincha Islands to. the United States for a given rate per ton, and. the defendants stipulated to pay that, rate, and if they paid or contracted to pay other vessels a higher rate before the Shirley finished loading, then they agreed to give the plaintiffs an additional compensation equal to that excess ; and for .that excess of rate per ton the plaintiffs were entitled to recover, together with the balance of the account rendered, which was admitted to be correct by the defendants.' . These suggestions lead necessarily tó the conclusion that there is-no error in the charge of the Circuit Court, so far as respects the construction of the contract, as the instruction in that particular was. in strict conformity to the views here expressed. It was to the effect that if the jury found that the defendants had agreed to pay others more than twenty-five dollars per ton for bringing guano from the Chincha Islands to the United States under charter-parties executed here between the dates before mentioned, then they were authorized to find a verdict in favor of the plaintiffs for that excess. All of the charters relied on by the plaintiffs as tending to show that such was the fact, were substantially of the same character, so that if one had that tendency, then all had, and that was conceded in the argument,-and must have been so understood by the jury.
 

 II. In the next place, it is insisted that the declarations and statements of the age.nts of the defendants, made at the time those charters were executed, -were improperly admitted as evidence, and two . grounds are assumed in support of the. proposition. First, that they were made without, authority, and therefore were not admissible to affect the interests of the defendants; and, secondly, that they were admitted in violation of the well-known rule that parol evidence is not admissible to explain, vary, or contradict, a written-instrument. All such declarations and statements -made .subsequently to the execution- of the charters were properly ruled out-and excluded from the consideration of the jury. ' '
 

 
 *164
 
 1. Some brief reference to the facts of tbe case becomes necessary, in order to test the correctness of the first ground assumed under this last proposition. Pull authority had been conferred upon those agents to negotiate for the vessels whose charters were introduced by the plaintiffs. Those declarations and statements were made by their agents in respect to the subject-matter of the negotiation, and at the time the charters were presented to the owners of the vessels for execution. After they were executed by the owners, they were forwarded to the defendants and received their signatures, and every assurance given by the agents to the owners of .the vessels was subsequently made good by the defendants. They were told there was no outward cargo for them, and that they might proceed immediately; and they were allowed to do so, without objection or remonstrance. The vessels carried out no freight, and, on their return, the owners were paid thirty dollars per ton on.the return cargo, without hesitation or,complaint. Accompanying those explanations were others to the effect that the stipulation in question had been inserted in the charters, so that they might not conflict with those previously'made pro viding for a rise in freight; and the circumstances fail to dis close-gny other substantial purpose for which it was done.
 

 . Parties do not usually contract heavy pecuniary obligations without some object in view; and as no substantial one is disclosed, except the one assigned by the plaintiffs, it is impossible to say, as matter of law, that the charters in question and the surrounding circumstances had no tendency to maintain the issue for the plaintiffs. Where the fact of agency has been proved, says Mr. Starkie, either expressly or presumptively, the act of the agent, co-extensive with the siuthority, is the act of the principal, whose mere instrument he is, and then, whatever the agent says, within the scope of his authority, the principal says; and evidence may be given of such acts and declarations, as if they had been actually done and made by the principal himself. That principle was directly sanctioned by this court in United States
 
 v.
 
 Gooding, 12 Wheat., 470, where the views of the author, as above quoted, were cited and approved (2 Star. Ev., 45.) Whatever the agent
 
 *165
 
 does in the lawful prosecution of the business intrusted to him by the principal, is the act of the
 
 principal;
 
 and there, says Mr. Greenleaf, his representations, declarations, and admissions, respecting- the subject-matter, will also bind him, if made at the same time, and constituting a part of the
 
 res geslae,
 
 and they are of the nature of original evidence, and not hearsay; and Judge Story, in his valuable Treatise on the Law of Agency, maintains the samé doctrine. (1 Greenl. Ev., 35; 113 Story on Ag., sec. 134.) Acts and declarations of an agent are admissible under such circumstances, upon the ground that, whatever an agent does or says in reference to the business in which he is at the time employed, and within the scope of his authority, is done or said by the principal, and consequently may be proved in like manner as if the evidence applied personally to the principal. (American Fur Co.
 
 v.
 
 The United States, 2 Pet., 364.) On the whole case, we are of the opinion-that the .evidence of original authority in the agents was sufficient to warrant the court in submitting their .declarations and statements to the jury.
 

 In the same connection* it was also denied at the argument that there is any sufficient evidence in the case to show that the agents of the defendants had any authority to make deviations from the
 
 proforma
 
 charter-party furnished to them on the first day,of June, 1854. A recurrence to the evidence, however, ' will show that the suggestions are not well founded. They commenced negotiating for vessels under those instructions shortly after they were received, and, continued the business till nearly the close .of July. All the charters,.- after they were executed by the owners, were forwarded- to the defendants, and received their signatures. One bears date as early as the fifth day of J une, and others as late as the twenty-ninth day of July, showing that they were approved as they were forwarded, -and at different times. These facts present strong presumptive evidence of authority, fully warranting the court in submitting the question to ,the jury.
 

 2. The sécond .ground assumed by the defendants, under this proposition, is, that the declarations and statements of their agents ought to have been excluded, for the reason that
 
 *166
 
 parol evidence is not admissible to explain, vary, or contradict, a written contract. That principle, as a general rule applicable to parties and privies, and their'representatives, aud those claiming under them, is undeniable, and is not disputed by the counsel of the plaintiffs/ They contended, however, in the court below, and still insist, that the right of the plaintiffs to demand additional compensation in this case was made to depend, by the express words of the contract, upon the subsequent transactions of the defendants in the same trade,- aud that the stipulation .in the subsequent charters is so framed that it covers up and conceals the real nature of the contracts between the parties. They went farther in the court below, and still insist that the real contract wás one to pay thirty dollars per ton to bring guano from the Chincha Islands to the United States, and that the stipulation was framed in the form in which it appears, graduating five dollars on the outward and twenty-five -dollars on the home voyage, for the express purpose of relieving the defendants from the responsibility which they had incurred to the plaintiffs, under the charter of the Shirley, and the jury have found all these alleged facts in
 
 favor
 
 of the plaintiffs. "Whether the jury were warranted in so finding or not, is not a question for an appellate tribunal. That question cannot be re-examined by this court. Eor the purposes of any examination of the case which it is competent for this court to make under the Constitution of the United States and the law’s of Congress, it must be assunjed. that the facts of the case have been correctly found by the jury. Repeated decisions of this court have affirmed the doctrine, w’hich is but a .repetition of the constitutional provision upon the subject, that no fact tried by a jury shall be otherwise re-examinable in any court of the United States than according to the rules of the common law; and it is well known that the only modes known to the common law of re-examining tibe facts of a case, after they have been found by a jury, are the granting of a new trial by the court where the issue was tried, or to which . the record was properly returnable,- or by the award of a
 
 venire facias de novo
 
 by an appellate court, for some error of law which intervened in the proceedings
 

 
 *167
 
 Parsons
 
 v.
 
 Bedford et al., 3 Pet., 447.
 

 United States
 
 v.
 
 King et al., 7 How., 845.
 

 Richardson
 
 v.
 
 Doane, 3 Dall., 102.
 

 United States
 
 v.
 
 Eliason, 16 Pet., 301.
 

 Phillips
 
 v.
 
 Preston, 5 How., 289.
 

 . Whether the evidence, when offered, is admissible, is a question for the court; but when admitted, the question whether it is sufficient or not is for the jury, and it is their province to draw from it all such inferences and conclusions as it conduces to prove, and which, in their judgment, it does prove; and their finding is conclusive, unless a new trial is awarded by .the..court in which the case is tried, or in the appellate tribunal, for-some error of law. ' Guided by these principles, it. must be assumed, in the further examination of this , question, that 'the. facts are as they have been found to be' by the jury It then appears that the real -contract in these charters-was one to pay thirty dollars per ton for bringing guano from the,Chincha Islands to the United;' States, and that the stipulation in. question was inserted in the charters to cover up and conceal the real nature, of the contract, in order to enable the defendants'to relieve themselves'from the responsibility which they had incurred in .their previous contract with the plaintiffs; and the question is, whether the parol evidence was properly admitted to-prove those facts. When the plaintiffs offered to prove those facts in the court below, the question was then presented to the Circuit Court precisely as it is here stated. Evidencé, when offered at the trial, must be assumed to exist,- and to be.true, for the purpose of determining the question of its admissibility. Proof, such as was offered and received in this case, could only be rejected upon one of two grounds— first, that the. evidence of the facts was not admissible; and, secondly, that- if the facts-were proved, they would have no tendency to maintain the action. That they would maintain the action if proved, no one can doubt; so that the only.ques tiop is, whether they were admissible.
 

 One further explanation is necessary, in order to present the question in its true light. It is not pretended that the parol evidence conflicts in any manner with the written conti act on
 
 *168
 
 ' which the suit was brought. • On the contrary, the objection is directed solely to its effect upon the charter-parties subsequently executed by the .defendants with the owners of the other vessels. Those charters were introduced by the plaintiffs as evidence in the cause, to show their right to recover. They'also relied on the circumstances attending the transactions, and the declarations and statements of the agents who negotiated them, and the subsequent conduct of the defendants in respect to the same subject-matter. At the trial, the charters were submitted to the jury as evidence, and the jury were told, in effect, that they were not confined to the charters •alone, but were at liberty to consider them in connection with all the other' evidence in the case, in order to' ascertain what the real contracts were between those parties.
 

 "Where the "effect of á written agreement collaterally introduced as evidence, as in this case, depends, not merely on the construction and meaning of the instrument, but upon extrinsic facts and circumstances, the inferences of fact to be drawn from it must be left to the jury. It was so held by this court in Etting
 
 v.
 
 The Bank of the United States, 11 Wheat., 75, and we think the principle is corréet. In that ease, the testimony consisted of various communications and reports made to the bank, of their own transactions, and of the admissions of the parties or their agents, and it was insisted, on the part of the bank, that the jury were n.ot at liberty to draw, inferences of fact from the written evidence; to which objection, Marshall, Ch. Jus., replied, that “were .the fact as alleged, 'and were it true that all the testimony is in writing, the consequence drawn from it cannot be admitted.” . Other cases have been decided by this court, applying the same doctrine as in Iasigi
 
 v.
 
 Brown, 17 How., 182. That was an action brought to recover damages against the defendant for a. false representation respecting the pecuniary standing' of a third party, whereby the plaintiff had been induced to sell goods, and had incurred loss. Letters were introduced, and facts and circumstances' connected with them proved; and this court held that it was for the jury to say, after examining the letters in connection with the facts and' circumstances, whether they
 
 *169
 
 were calculated to inspire, and did inspire, a false confidence in the pecuniary responsibility of the party, to which the defendant knew he was not entitled.
 

 Another view of the question is also very properly invoked by the plaintiffs. Their claim to additional compensation, by the express words of the - contract, was made to depend upon their being able-to exhibit proof that the defendants had paid other parties a-higher rate than twenty-five dollars per ton for the same service. . Oral proof to that effect, if credible, was as good as written. They were at liberty to rely upon the one or the other, or upon both combined, as circumstances.might indicate it to be for their interest or convenience. Beyond question they might introduce those charters for that purpose, if they saw fit; or, if they had the means, and preferred to do so, they might prove their case by other evidence; and it cannot be maintained that their right to do so was in any manner impaired after' those charters were introduced. They were not parties to those contracts, nor did they in any legal sense claim under them. Their rights being made to depend upon the subsequent transactions of the defendants with third parties, it was clearly proper to admit proof to show what those transactions were.
 

 Several courts and text writers have stated the principle much broader than it is here laid down. The rule excluding parol proof in such cases, says Mr. Greenleaf,-cannot affect third persons; who,' if it were otherwise, might.be prejudiced by things recited in the writings contrary to the truth, through the ignorance, carelessness, or fraud, of the parties, and who therefore ought not to be precluded from proving the truth, however contradictory to the written instruments of others. In Krider
 
 v.
 
 Lafferty, (1 Whar., 314,) it is held, that the-rule is applicable only in suits between parties to the agreement, and their representatives and those claiming under them, and not to strangers. It is also held in England, in several cases, that the rule is not applicable to strangers. (King
 
 v.
 
 Inhabitants of Cheadle, 3 Barn. and Ad., 833; 2 Taylor’s Ev., sec. 827, and cases cited; Wilson
 
 v.
 
 Hart, 7 Taun., 294; Overseers of Berlin
 
 v.
 
 Norwich, 10 John., 229; Poth on Obl., by Evans, n. 766; 2
 
 *170
 
 Cow. and H., notes, 354, 368; Reynolds
 
 v.
 
 Magness, 2 Ired., 26; 1 Greenl. Ev., sec. 279.)
 

 Parol testimony is always admissible in masters of contract, ' to. .show fraud, notwithstanding its effect may be to contradict what is in writing. : That principle is too well established and too generally acknowledged to require any confirmation. Parties have the right to make their own contracts; and, in general, when, they are satisfied, that is sufficient, and others have no right to cbmplain. Cases, however, occasionally arise, where a contract, though
 
 bona fide
 
 between those who made it, may operate" as a fraud upon, third parties; and in this case, assuming the facts to be as they have been found by the jury, and as the evidence tends to prove, that the stipulation in question was inserted in those charters for the purpose of enabling the defendants, by that device, to avoid their responsibility to the plaintiffs, whether the owners of the vessels knew the purpose or not, the act so far partakes of the nature of a fraud between the parties to this suit as to authorize the introduction of paroi evidence, to show what the truth was in regard to those transactions.
 

 Eor these reasons, we are of the opinion that the instructions given -by the Circuit Court were correct, and that there is no error in the record.
 

 The decree of the Circuit Court therefore is affirmed, with costs. '
 

 Mr. Justice WAYNE, Mr. Justice CATRON, and Mr. Justice CRIER, dissented. -