HOLMES v. MONTAUK STEAMBOAT CO., Limited.

(Circuit Court of Appeals, Second Circuit.    April 4, 1899.)

No. 126.

1. SHIP BROKERS—COMMISSIONS—SALES—OPTIONS—LOSS OF VESSEL—INSURANCE.
     A charter party gave the charterer the option of purchasing the vessel at any time during the charter, and required the charterer to keep the vessel insured, and provided that a "commission of five per cent. on the full amount of charter, also on sale of steamer, when sold, is due, on signment hereof, to [the broker who negotiated the charter], ship lost or not lost." *Held* that, where the ship was lost before an exercise of the option, the broker was not entitled to a commission on the insurance money, as for a sale.

2. SAME.
     It was immaterial that the charterer had intended to exercise the option.

3. PAROL EVIDENCE—CONTRACTS—PROVINCE OF COURT.
     In an action for a commission on the insurance money, the broker sought to show an oral agreement entitling him thereto, and introduced the charter party in evidence. *Held,* that there was no ambiguity or obscurity in the instrument requiring a resort to facts aliunde to insure a correct construction thereof, and the court properly instructed that it did not provide for the commission sued for, leaving it to the jury to find whether there was an oral contract.

4. SAME—ADMISSIONS BY AGENT—CORPORATIONS.
     The broker, having testified that after the loss of the vessel he held a conversation with defendant's president respecting the commission, he was asked, "What took place between you?" *Held,* that an objection thereto was properly sustained, where it did not appear how long after the loss the conversation took place, nor that the president had express authority to make admissions as to past transactions, nor that it was part of his duty to do so.

5. TRIAL—REQUESTS FOR INSTRUCTIONS—TIME.
     Requests for instructions covering the entire case should be presented before the colloquial charge.

6. SAME—BURDEN OF PROOF—INSTRUCTIONS—IMPLIED CONTRACTS.
     In an action for commissions for services as broker, where defendant admitted that plaintiff was entitled to a certain commission, which had been paid, and plaintiff claimed a further commission under an oral agreement which defendant denied, a charge that plaintiff must produce the greater weight of evidence was not objectionable on the ground that, after it appeared that plaintiff had rendered services and that they had been accepted, he was not bound to show by a preponderance of evidence that he was to be paid therefor.

7. SAME—OBJECTIONS—WAIVER.
     Though a charge that, "if your minds happen to be just even, that would show the evidence did not preponderate either way," and the ver-

732 93 FEDERAL REPORTER.

dict should be for defendant, is open to the construction that a verdict should be brought in for defendant if the jury stood six to six, it was not available error, where the attention of the trial court was not called to it by special objection.

8. SAME—CHARACTERIZATION OF WITNESSES.

It is not error for the court, in the charge, to characterize a witness as a well-known and capable member of the bar.

In Error to the Circuit Court of the United States for the Eastern District of New York.

This cause comes here upon a writ of error by plaintiff below to review a judgment of the circuit court, Eastern district of New York, entered upon a verdict of a jury in favor of defendant below. The facts sufficiently appear in the opinion.

Geo. B. Adams, for plaintiff in error.

Wm. A. Jenner, for defendant in error.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. On January 14, 1896, a written charter party, drawn up by plaintiff, was executed by defendant and the Key West & Miami Steamship Company, by which defendant agreed to let, and the Key West Company agreed to hire, the steamboat Shelter Island for four months from February 1, 1896, to be employed between Key West and Biscayne Bay, for $100 a day. The charter party further provided that the Key West Company should redeliver the steamboat to the defendant, at the termination of said agreement, in the same good condition as received, ordinary wear and tear excepted; that the charterers should have the option at any time during the charter to purchase the steamboat for the sum of $60,000; that, if charterers should exercise such option and purchase said steamboat, all charter money paid should be applied on purchase; that charterers should give a "New York banker's guaranty for the full amount of all charter, charter moneys to be paid during the period of this charter, to insure payments when due, and for the faithful performance of all other conditions of this charter party"; that the charterers should "cause insurance to cover value of said steamboat herein expressed to be effected, in a company satisfactory to the owners of said steamboat, against fire and all marine risks, including collision and damage done to other vessels or received by said steamboat other than by collision, in the name of, and for the benefit of, the owners of said steamboat, and shall pay the premium therefor." The charter party also contained the following clause:

"Commission of five per cent. on the full amount of charter, also on sale of steamer, when sold, is due, on signment hereof, to Samuel Holmes, 66 & 68 Broad street, New York, ship lost or not lost, by whom the vessel is to be reported."

Holmes, the plaintiff, was the broker through whose intervention the charter was made.

On the signing of the agreement the Key West Company paid to defendant $3,000 in cash and $9,000 in notes. It also effected insurance in conformity with the terms of the charter party, and paid the premiums therefor. The plaintiff duly received $600, being 5 per

cent. on the $12,000 so paid by charterers. The steamboat was delivered to the Key West Company on or about February 12, 1896; and while on her way South she foundered at sea, becoming a total loss. Substantially the full amount of insurance was paid to the defendant by the insurance companies.

After setting out briefly the negotiations of plaintiff and the terms of the charter party, including the one last above quoted, as to payment of commission to the plaintiff, the complaint avers that:

"Defendant further promised and agreed, in consideration of the services rendered by plaintiff as hereinbefore set forth, that if the steamboat should be lost before the option to purchase the same was exercised by the Key West & Miami Steamship Company, or before a purchase of the same was actually made by said Key West & Miami Steamship Company, the defendant would pay to the plaintiff 5 per cent. on the insurance money which it might collect and receive under policies of insurance taken out under said agreement; and said services were rendered by plaintiff on the faith of said promise, and in full reliance thereon."

This averment is specifically denied by the answer, and is the only issue in the cause. Plaintiff and another witness gave testimony tending to show such an agreement to pay 5 per cent. on insurance moneys, and were contradicted by three witnesses called by defendant. A number of letters and telegrams passing between the parties to the suit or to the charter party were put in evidence, but none of them contained any reference to the particular subject of controversy. The case was sent to the jury, to find, from these letters and telegrams, from the charter party itself, and from the testimony of the witnesses as to the oral conversation, whether any agreement such as the complainant declared upon was in fact made.

The first assignment of error is to the court's refusal to direct a verdict in favor of the plaintiff. Plaintiff contends that, although the charter party was not a contract between plaintiff and defendant, it was conclusive evidence of a contract between them, by the terms of which plaintiff was entitled to commission on the insurance money paid upon loss. The clause relied upon is, "Commission of five per cent. on the full amount of charter, also on sale of steamer, when sold, is due, on signment hereof, to Samuel Holmes,  *  *  *  ship lost or not lost;" and the theory of plaintiff is that, "in all fairness," the phrase "amount of charter" means all that is obtained by the owner under the charter. But, although the premiums of insurance which the charterers agreed to pay may perhaps be said to be obtained by the owner under the charter, the moneys paid by the insurance companies upon loss ' of the vessel were obtained under a different and independent contract with the companies themselves. Indeed, it might be very doubtful whether, if the Key West Company had exercised its option, and subsequently bought the steamboat, the purchase money could be held to be "amount of charter," since an additional contract was necessary to its production. All such doubt, however, was resolved by the addition of the clause, "also on sale of steamer, when sold." It is argued that the "narrow construction given  *  *  *  excludes the broker from all remuneration for his important services, except for the amount paid on account of the contract." The important services rendered were twofold: First,

such as produced the charter party, with the obligations that contract imposed upon the charterers, to which extent 5 per cent. on the amount of their obligations was a full remuneration; and, second, such as were directed towards procuring a purchaser of the boat at $60,000, but no such purchaser was in fact procured, and the boat was never sold. The language of the clause as to commissions above quoted is clear, plainly expressed, and wholly unambiguous; and the contention that it covers the insurance moneys paid upon loss, because it required the charterers to pay the premiums, is wholly without merit. Inasmuch as there was a conflict of oral testimony as to whether defendants had.agreed to pay plaintiff commissions on the insurance moneys, the court properly submitted that question to the jury.

2. It is next contended that the "charter was at least ambiguous, and it was for the.jury to construe it in the light of all the evidence." This assignment of error is based upon several exceptions to the charge, which, in one way or another, instructed the jury that the charter party did not contain any provision for the payment of commissions on insurance moneys. A single excerpt will be sufficient. The court, in response to a question by a juror, charged as follows:

"Suppose the plaintiff had come here, and put this charter party alone in evidence. That would not have sustained the plaintiff's case. The plaintiff must have an agreement, outside of this charter party, providing for the payment of the five per cent. on the insurance money which he claims. While you are determining whether such an outside agreement was made, you will consider the charter party. You.may take into consideration what is recited in the charter party with reference to his commission, either for the plaintiff or against him, only you will put upon these words the interpretation that the court has, so far as this: That the court says those words mean that the plaintiff should have five per cent. on the amount of the charter and five per cent. on the amount received if the sale were consummated, and that they did not in any way imply or signify that he was to have five per cent. on insurance money."

To this instruction plaintiff duly excepted.

We find no error here. There was no ambiguity or obscurity in the charter party; no such doubt as to its meaning as would require a resort to facts aliunde to insure a correct interpretation. The charter party was not a contract between the parties to this suit. It bound neither of them. Each side was entirely free to introduce evidence contradicting its express provisions, or supplementing them, or showing that it incorrectly expressed the true intention of the signers, or of either of them. Both sides availed of such privilege, and did examine witnesses who testified pro and con as to a contract to pay Holmes commission on the insurance money. The court submitted the question whether or not there was such a contract to the jury, instructing them that they had three classes of evidence which they should consider:

"First, the letters which passed between Mr. French, or other officers of the defendant, and this plaintiff; second, this charter party; third, the parol or oral conversation which happened at the office of the plaintiff on January 15, 1896, when this charter party was passed."

The jury were left entirely free to find that there was an agreement to pay commission on the insurance money, although the charter party

was silent on that subject; but they were told, and rightly told, that the charter party was silent on that subject. Considered merely as an instrument of evidence,—and that is all the charter party was in this case,—a written instrument which is not obscure or unambiguous must be taken as declaring exactly what it purports to declare, although the jury, weighing it with the other evidence in the case, may reach the conclusion that its declaration, like the oral statements of some witness, is inaccurate. The proposition is well expressed in Barreda v. Silsbee, 21 How. 146:

"Where the effect of a written agreement collaterally introduced as evidence depends, not merely on the construction and meaning of the instrument, but upon extrinsic facts and circumstances, the inferences of fact to be drawn from it must be left to the jury."

In the case at bar the court construed the instrument, and instructed the jury as to its meaning, and then left it to them to find the inferences of fact to be drawn from the making and signing of that instrument, considered in connection with all the other evidence in the case.

3. It will not be necessary to review at length all the exceptions to refusals to charge as requested. They but present the question already discussed in different forms.

4. The exceptions to the charge may next be considered.

The court charged:

"As the plaintiff must produce the greater weight of evidence, if your minds happen to be just even, that would show the evidence did not preponderate either way. Under those circumstances, it would be your duty, if you did not go beyond that point, to bring in a verdict for the defendant."

Plaintiff duly excepted. He contends that the burden was not upon the plaintiff, after it appeared he had rendered services and they had been accepted, to establish by a preponderance of evidence that he was to be paid for his services. No one, however, disputed an obligation to pay him 5 per cent. on the full amount of the charter, and 5 per cent. on sale, when made. The point is too trivial to merit consideration. It is further contended that the jury were thus instructed that, if they stood six to six, they should bring in a verdict for defendant. The language used is open to that construction, although it is more likely to be understood as expressing the meaning intended to be conveyed, viz. that, if their minds reached no conclusion either way, their votes should be for defendant. The attention of the court should have been called to this particular ambiguity of expression, which would have been at once made clear. Probably this was not done because such defect was not then apparent to the mind of the exceptant. An exception to the entire clause was no doubt taken as claiming error in charging that plaintiff had the burden of proof. The second and eleventh exceptions cover a question of measure of damages, which need not be considered. The third covers that portion of the charge (quoted ante) as to the meaning of the charter party, which has been already discussed. The fourth exception is to so much of the charge as instructed the jury that they will find nothing in the correspondence that defendant agreed to pay 5 per cent. on the insurance money. As matter of fact, the correspondence contains

nothing on that subject; but the judge merely told the jury "he thought" they would find nothing there, and expressly instructed them that on that point they must follow their own recollections. The fifth, sixth, seventh, eighth, tenth, and twelfth exceptions are to the court's instructing the jury as to the meaning of the charter party. They have been already disposed of. The ninth is to the characterization of one of the witnesses as a "well-known and capable member of the bar." This exception is without merit.

5. A few exceptions to the exclusion of evidence remain to be considered. Plaintiff had testified that after the loss of the vessel he had a conversation respecting his commission with Mr. Cook, the president of the defendant. He was then asked, "What took place between you?" Upon objection, the court, stating that the question was whether a conversation with the president of the company after the loss occurred would be binding on the company, excluded the evidence "for the present." At the time this ruling was made, it did not appear how long after the loss the conversation took place, nor that the president was present at the conversation at which it is contended the payment of the commission was assented to, nor that he had any express authority to make admissions as to past transactions, nor that it was any part of his duty so to do. In this state of the evidence, the broad question, calling for any and all statements made by the president in reference to plaintiff's claim for commissions, was properly excluded. Examination of the record on appeal in Hoag v. Lamont, 60 N. Y. 96, cited by plaintiff to sustain his exception, shows that the cases are in no respect parallel. Lamont, Waldridge, and Andrews were parties to a contract with plaintiff's assignors whereby the latter were to sell the former's product on commission, which commissions were guarantied to reach a fixed sum. Lamont, Waldridge, and Andrews subsequently formed a company (of which they became directors; Waldridge, president) to continue the manufacture. Plaintiff's assignors called on Waldridge to ask if their contract was assumed by the new corporation, and he told them it was, and that they should go on with the business as agents of the company, whereupon they rendered the services for which the action was brought. Exception was taken to the exclusion of a letter sent by the firm of Smith & Hicks to the president of the charterers, dated January 8, 1896, which stated that Smith was a director of defendant, and that the price of the Shelter Island was $50,000; also, some conversation in regard to the same which took place at the time the charter was executed. Neither had any bearing on the question whether or not there was an agreement to pay plaintiff commission on insurance moneys. Some evidence was also excluded as to a conversation between the president of the Key West Company and the captain of the Shelter Island while on her way South, indicative of a desire to exercise the option to purchase. It was immaterial. The option never was exercised, nor the sale effected, and the state of mind of the Key West Company subsequent to the execution of the charter party could throw no possible light upon the agreement entered into between plaintiff and defendant at or prior to such execution. The judgment of the circuit court is affirmed.