## LEVERING v. INDEMNITY INS. CO. OF NORTH AMERICA et al.

### No. 6199.

Circuit Court of Appeals, Ninth Circuit.

May 8, 1931.

Rehearing Denied June 15, 1931.

Bicksler, Smith, Parke & Catlin, H. E. Booth, and Martin M. Levering, all of Los Angeles, Cal. (Henry Trowbridge, of Los Angeles, Cal., on the brief), for appellant.

Hartley F. Peart, of San Francisco, Cal., and Gallaher & Ozias, of Fresno, Cal., for appellee Indemnity Ins. Co. of North America.

Everts, Ewing, Wild & Everts, of Fresno, Cal., for appellees Vogel and others.

Young & Hudson and Bert F. Rabinowitz, all of San Francisco, Cal., for appellee Crowell.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

WILBUR, Circuit Judge.

This action is brought upon an indemnity bond given January 26, 1924, on behalf of the sellers to the purchaser, the appellant, in connection with a sale and as an inducement to the purchase of a majority of the shares (679) of the National Bank of Bakersfield, at $140 per share. Judgment was rendered for the defendants, and the plaintiff appeals. The case was tried by the court without a jury in pursuance of a stipulation in writing, and written findings of fact were made by the court. It appears from the written agreements made at the time of the sale that the primary purpose of the parties was to provide the bank with liquid assets in an amount necessary to satisfy the comptroller in lieu of frozen assets of the bank. These frozen assets already amounted to $133,000 at the time of the sale, and it was anticipated might amount to $299,641.88 more, a total of $432,641.88. The bank capital was divided into 1,000 shares, apparently of $100 each, although that does not clearly appear in the record. The liquid assets were to be furnished in cash to the bank by the appellant, to the extent of the purchase price he agreed to pay therefor, $90,060, if necessary. The purchase price was impounded in escrow for that purpose. The balance when needed was to be paid by the sellers. The latter agreement was guaranteed to the extent of $50,000

by the appellee Indemnity Insurance Company of North America by the surety bonds herein sued upon. The frozen assets and those which subsequently became so were to be the property of the sellers, pro tanto, as soon as cash was supplied to take the place of such assets, although the bank was to retain title and possession thereof for the purpose of collection, the proceeds thereof to be turned over by the bank to the sellers. The defendants, other than the Indemnity Insurance Company, are the sellers. The bank was not a party to those agreements, although it was to be the beneficiary thereof, and was to pay to the sellers a part of the consideration moving to them therefor, that is, the sums realized from the frozen assets, when collected. It was agreed that an assessment of $27 per share to cover a portion of that amount would be paid by the appellant as a part of his purchase price. The purchase price of $140 per share was agreed to on the express understanding that $299,641.88 of assets were good.

In view of the fact that the value of these assets was somewhat impaired and so recognized, stipulations were entered into in the contract, and the bonds herein sued upon were given on January 26, 1924, to make good to the purchaser any loss which might be suffered by reason of the loss or diminution of these assets. The importance of these agreements will be observed when it is noted that the book value of these assets considered good was twice as great as the total value of the stock of the bank, estimated at the contract price of $140 per share, and that assessments aggregating $182 per share were subsequently levied upon this stock as a result of the charging off of these assets, although the contract of purchase and sale was predicated upon the assumption that these obligations are worth their face values. Before the payment of the purchase price by appellant had been completed as had been anticipated, the comptroller had directed that an additional amount of $92,000 should be charged off because of items embraced within the total of $299,641.-88 of guaranteed but doubtful value. In order that this assessment on the 679 shares should be paid off, a supplemental agreement dated March 10, 1924, was entered into by all parties to this action whereby the vendors of the stock agreed to the application of the $25 per share that had already been paid into escrow by the appellant to discharge this new assessment, and the appellant was to pay and did pay the balance of $42,128. The capital of the bank had thus been augmented by $119

per share. The total amount thus paid by the appellant to the bank was sufficient to constitute the entire purchase price on 553 shares of the stock at $140 per share, and in accordance with this supplemental agreement this stock was delivered to the appellant as purchaser as having been fully paid for by him. The delivery of the other one hundred twenty-six shares was not made as agreed by the appellees in the original and supplemental agreements because they were not able to secure possession thereof. The effect of this failure is not discussed in the briefs, and for that reason we ignore it in our decision.

After the agreements of January 26, 1924, the comptroller directed that $90,000 more of the guaranteed indebtedness of $299,641.88 be charged off the books of the national bank. This was done, and subsequently an assessment of this amount was levied in pursuance of such order. This assessment was paid by the appellant on the 553 shares sold to him, amounting to $49,770, and he sues to recover the amount so paid in accordance with the provisions of the contract and bond by which the appellant was guaranteed against loss due to the charging off of these accounts, less about $553 which had been collected by the bank upon the guaranteed accounts which, under the terms of the agreement, were applicable to diminish the amount the vendors had agreed to pay. Appellant thereupon demanded from his vendors and surety the repayment of the amount of the charge off and of the assessment which he had paid, and upon their failure so to do brought this action. The appellees answered his complaint claiming that they were not acting on their own behalf in making such sale, but were merely trustees for the Valley Bank of Fresno. The appellee Indemnity Company claimed it had been induced by representations to the contrary in executing the bond. The other appellees, claiming to be acting as trustees or dummies in making the sale to the knowledge of the appellant, also seek thus to escape the consequences of their default. It was also claimed that the appellant had purchased as a trustee for divers persons unknown to the defendants. Allegations of the charge off and assessment of the $90,000 were denied for lack of information and belief, and it was claimed that the appellant had violated his contract of purchase because the bank had failed to use due diligence in the collection of its frozen assets. Apparently the appellees also claim fraud by concealment of the fact of appellant's trusteeship and also mistake as to the actual contract guaranteed in

the effecting of the agreements and bond herein sued upon, although such fraud and mistake are not very clearly alleged and were not established. They also alleged lack of notice. These allegations and others are not very clearly set forth and in the main are statements or allegations as to the legal effect of the contracts entered into. They need not be further considered, however, as the trial court found the law and the facts on all these issues in favor of the appellant. However, upon the trial it developed that appellant had resold 543 shares of the stock purchased by him for the sum of $150 per share. For that reason the trial court concluded that he had not been damaged by the charging off or loss of assets of the bank, and that his payment of the amount of the assessment had been voluntary, and for that reason gave judgment for the defendants. The sole question presented by the appeal is as to the decision of the court upon this point. The facts are not in dispute, and the question presented is thus one of law. This point we will now consider.

Appellant testified that at the time he made the sale of the stock to his numerous vendees at the price of $150 per share he agreed with his vendees that he would protect them against loss suffered by depreciation of the assets included in the $299,641.88, and that as an inducement to such purchasers to purchase the stock at the price of $150 per share he had shown them the contracts and bond herein sued upon which he had received in connection with his purchase of the stock at $140 per share and assured them that they were thereby fully protected against loss due to the depreciation of such assets, and that he would guarantee to them that they would be thus fully protected, and in pursuance of such agreement he did promptly pay said assessments upon the stock he had sold. The difficulty, however, is that the written contract between the appellant and his vendees for the purchase and sale of the stock made no reference to the contemporaneous agreement and representations as to the payment of such losses or assessment by which the appellant bound himself to give his vendees the full benefit of the agreements and bond which he had received. The appellee's theory sustained by the court is that, inasmuch as the agreement between the appellant and his vendees was in writing, appellant could not be held by them to his oral agreement to make good losses they might suffer or the bank might suffer by reason of the charging off of the bank's assets. Consequently, it is contended in complying with his oral agreement with them appellant was merely performing a moral obligation and not a legal one and that he cannot recover on the bond because there has been no legal loss such as was guaranteed by the bond. On the other hand, it is contended by the appellant that the agreement between the appellant and his vendees to pay the amount of the assessments levied against their stock by reason of the freezing of its assets was a collateral agreement not conflicting with the terms of the written agreement for the sale of appellant's stock to his purchasers and was therefore enforceable between the parties thereto, consequently, that the payment made in conformity with such collateral agreement was not voluntary, but in compliance with a binding agreement, citing Sav. Bk. of So. Cal. v. Asbury, 117 Cal. 96, 103, 48 P. 1081; 22 C. J. 1145, 1245, 1246, 1253, 1254; Jones on Evidence, vol. 3, § 439; Whittier v. Bank, 161 Cal. 311, 119 P. 92.

Appellant also contends that the rule against varying the terms of a written agreement by evidence of parol stipulations in conflict with a contemporaneous written agreement does not apply to actions between third parties, citing Mitchell v. McShame Lbr. Co. (C. C. A.) 220 F. 878, 879; Barreda et al. v. Silsbee, 62 U. S. (21 How.) 146, 169, 16 L. Ed. 86; Sigua Iron Co. v. Greene (C. C. A.) 88 F. 207, 217; Budd v. Hughes, 176 Cal. 687, 689, 690, 171 P. 287. This point seems to be well established and is conceded by the appellees, but it is contended that the relationship between the parties to this suit makes them parties or privies thereto, and consequently the rule applicable to the right of third parties to object to such parol evidence does not apply, citing Williston on Contracts, vol. 2, p. 1252; Current v. Muir, 99 Minn. 1, 108 N. W. 870; Allen v. Ruland, 79 Conn. 405, 65 A. 138, 118 Am. St. Rep. 146, 8 Ann. Cas. 344; Brenner v. Luth, 28 Kan. 581. However that may be, it is clear that the appellant had a right at any time to reduce to writing this oral agreement with his purchasers either by amending the written agreement, or by a supplemental or collateral agreement in writing evidencing the actual agreement made at the time of his sale. The appellees had nothing to do with such a contract; they were not parties or privies to it, and are not in a position to take advantage of a blunder in reducing the contract to writing (Commercial Tr. & Sav. Bk. v. White, 145 La. 54, 81 So. 753, 755), if the appellant repairs the blunder by furnishing proper evidence of the actual agreement. He did so

when in compliance with his oral agreement he paid the amount to the bank that he had agreed to pay. The verbal agreement having been fully executed in that regard was binding on both the parties thereto. Estate of McDougald, 146 Cal. 196, 79 P. 875; Dunn v. Price, 112 Cal. 46, 44 P. 354.

We think that the payment by the appellant to the bank in pursuance of his verbal agreement with his vendees so to do furnished evidence of the actual contract between the appellant and his vendees of the stock admissible in this action between the appellant and the defendants, his vendors, and their surety. The liability of the appellees, however, did not depend upon the fact of payment to the bank of an assessment levied to prevent the impairment of its capital, but arose at once upon the requirement by the comptroller that assets in the schedules A. and B. (items making up the total of $299,641.88) be charged off. The agreement of the Indemnity Company and of appellant's vendors was that they would pay to him the amount thereof upon notice; the purpose being to furnish liquid funds to replace the frozen assets condemned by the comptroller so that the bank could continue as a going concern. Whether there would be an ultimate loss to the appellees would depend upon the collectibility of such assets. The loss to the appellant occurred when he was compelled to pay more on account of his stock than the agreed purchase price.

Judgment reversed.

SAWTELLE, Circuit Judge, concurs.