EDWARD ROSEWATER, PLAINTIFF IN ERROR, V. JOHN M. HOFFMAN, DEFENDANT IN ERROR.

1. **Libel and Slander:** INSTRUCTIONS TO JURY. An instruction to a jury by the district court, that an alleged libelous article set out in the petition was libelous *per se*, examined and sustained.

2. ———: DAMAGES: EVIDENCE. In an action for damages resulting from the publication of a libelous article in a newspaper it was *Held*, Error for the trial court to admit proof of, and instruct the jury to consider, the wealth of the defendant, in estimating the damages which the plaintiff should recover; exemplary damages not being recoverable in this state.

3. **Construction of Written Instruments, when a Question for Jury.** The general rule is, that it is the province of the court to construe written instruments and contracts entered into between the parties to the action; but where an instrument between one of the parties to the suit and a third party is collaterally introduced in evidence, the effect of which depends not merely on its construction and meaning, but also upon extrinsic facts and circumstances, the inferences to be drawn from it are inferences of fact and not of law, and being open to explanation, must be submitted to the trial jury.

ERROR to the district court for Lancaster county. Tried below before POUND, J.

*Mason & Whedon,* for plaintiff in error.

Ninth instruction should not have been given. *Boyer v. Barr,* 8 Neb., 70. *Roose v. Perkins,* 9 Id., 315. *Boldt v. Budwig,* 19 Id., 739. *Taber v. Hutson,* 5 Ind., 325. Sullivan on Damages, 733. *McConnell v. Hampton,* 12 Johns., 236.

*Sawyer & Snell,* for defendant in error, cited: 2 Greenleaf, Redfield's Edition, Sec. 269. *Bennett v. Hyde,* 6 Conn., 27. *Hosley v. Brooks,* 20 Ill., 117. *Shute v. Barrett,* 7 Pick., 86. *Brown v. Barnes,* 39 Mich., 215. Sutherland on Damages, Vol. III., p. 653.

REESE, CH. J.

This was an action for libel brought by defendant in error against plaintiff in error, in the district court of Lancaster county. The petition consists of three counts or causes of action, growing out of the publication of three alleged libelous articles in the Omaha *Bee,* and which were set out at length in the petition.

The answer filed by plaintiff in error consisted of an admission of the publication of the articles as alleged, but alleging that they were true and published without malice, with good motives, and for justifiable ends, and from no feeling of ill-will toward defendant in error.

No further notice need now be taken of the pleadings.

Upon the trial the court gave a number of instructions asked by defendant in error, among which was the following : "You are instructed that, as a matter of law, each of said three articles complained of are libelous, and the same not being privileged communications, if you believe from

the evidence that the same were published maliciously
(that is, without legal excuse) of and concerning the plaint-
iff, you will bring in a verdict for the plaintiff, unless you
further believe from the evidence that said articles and
charges therein contained and published of and concerning
the plaintiff were and are true."

This instruction was excepted to at the time it was given,.
the giving whereof is now assigned for error.   The objec-
tion is based upon the contention of plaintiff in error,
that the article published and alleged as the basis of the
second cause of action was not libelous.   The article re-
ferred to was as follows :

"THE TERRIBLE TRUTH.

"The Governor's Private Secretary Unmasked."

"An Interesting Chapter from the Life of J. M. Hoffman.

"LINCOLN, March 6.

"When I stepped into the office of the Gorham House
Wednesday evening, I was accosted by Hon. James M.
Woolworth, who said : 'You are creating considerable com-
motion at the capitol.   I should think you would be afraid
to come down here at this time.'   'Not at all,' said I;
'there is no man in this or any other city whom I am not
ready to face.   I presume you refer to my editorial about
the governor's secretary.'

"'Yes,' said Mr. Woolworth, 'you fired a terrible
bombshell.   The article created most intense excitement.
Is there really any truth in that charge?   They are liable
to give you trouble with a suit for libel.'   'Let them
come on with their libel suits,' I replied, 'I am well for-
tified, my witnesses are right here, and they are responsi-
ble and reliable.'

"Later in the evening, I met that veteran Lincoln lob-
byist, John McConnell, who said, 'Well, you have got
yourself into a terrible snap in charging Hoffman with
stealing a horse.   It is utterly incredible.   He has lived

here eight or ten years. He has a very nice family and is highly connected; you must surely be mistaken.' 'I am very sorry for Mr. Hoffman's family,' replied I, 'But I don't believe I have made a mistake in the man. My informant is one of (y)our most solid citizens. He owns $40,000 or $50,000 of property here, and certainly would not concoct such a story out of whole cloth. I saw him this evening just as I came in from the depot and he gave me some more particulars, which more than ever confirm my belief in the truthfulness of the charge.'

"'How did he come to tell you about this?' asked Mc-Connell. 'It was by mere accident,' replied I. 'Last fall, two or three weeks after the election, a letter appeared in the Chicago *Tribune*, from Lincoln, in which the writer undertook to discuss the political outlook. He interpreted the call issued for a meeting of the Farmers' Alliance as a part of the scheme for meeting the democrats and agreeing upon a division of the federal patronage. He represented the *Bee* as one of the important factors in the division of the spoils by the democrats, and declared that the owners of the *Bee* were democrats, while I was simply editing the paper for them. This was really a repetition of campaign falsehoods, which were circulated by Jim Laird and his strikers in the second district last fall. As a matter of fact, out of the $50,000 *Bee* stock, I own four-fifths, my brothers in Cleveland own all but $2,000 of the balance. The only democrat that owns stock in the *Bee* is Max Meyer, who owns just one share, and, as you know, is not a politician.'

"'I was somewhat provoked over this letter, and intended first to contradict, through the *Tribune*, but being suddenly called to Washington, I dropped the matter. When the legislature was about to convene I went to Lincoln, and incidentally inquired who was the correspondent of the *Tribune*. I was told by General McBride that Hoffman was the correspondent. The same day I met the man

who is my informant, and we talked over the political situation. After giving him my views, I referred to the letter in the *Tribune* as a tissue of falsehoods. "Who wrote the letter?" asked my friend. "Hoffman, Dawes' private secretary," said I. "Indeed! are you after that fellow?" said my friend. "He once served me a very scurvy trick. He borrowed my horse and saddle some years ago, and rode off and sold the property. He was arrested near Springfield, Missouri, and lodged in jail. The sheriff telegraphed me that he had him in charge, but I finally concluded I would not prosecute him. He was then released. If you write down there you will get other particulars." This was a great surprise to me, and I questioned my friend at considerable length about the matter, and became satisfied that Hoffman was a very bad man. Meantime I was called away to the deathbed of my mother, in Cleveland, and later on, to Washington, a second time, and the matter, for the time being, dropped out of my mind. When the report reached me about the testimony before the coroner's jury that was investigating Griffin's death, and the facts connected with the burglary of the state treasury, and the fact was drawn out that Dawes and Hoffman had both held conferences with the detectives before the shooting, it flashed across my mind that Hoffman might have been deeper in the scheme than has yet appeared on the surface. That's why I wrote the article.'

"'Well,' said McConnell, 'in your article you charge it upon Milton S. Hoffman; his name is J. M. Hoffman. He has been living here for years, right along, and nobody has ever heard a word against him.' 'That may all be,' said I. 'Many bad men have enjoyed good reputations until they were exposed. I may have made a mistake in the name, but the Hoffman I mean is Dawes' secretary.'

"'How about that burglary?' asked McConnell.

"'Never mind about that,' was my reply. 'For the present I can't go into the details, but I know what I am

talking about.' This morning I met Secretary Roggen at the capitol, and after talking over the Hoffman affair, he said, 'May you not be mistaken, after all? There was a George Hoffman here, on the *Democrat*, who was a dissolute character, and who was shot in Denver. He was not too good for horse stealing, or any other thing.' 'Mr. Roggen,' said I, 'there is a bare possibility that a mistake has been made, and if so, no man would be more sorry than I, and no man could make a more outspoken retraction than I.'

"In order to make assurance doubly sure, I asked a friend this afternoon to accompany me to the residence of my informant, and found him as positive as ever. 'Can't there be some mistake about this man Hoffman?' asked the friend who accompanied me. 'They say at the capitol there is some other Hoffman.'

"'Do I know my horse when I see it?" said my informant. 'Do I know my wife? Why of course it is J. M. Hoffman, Dawes' secretary. I'll tell you just how it happened. It was in the summer of 1879. Hoffman was going down south of here to fix some land claims, and he asked me to lend him my horse. She was a bay, which I paid $125 for, and I had refused $150 for her. I put on a new bridle. Hoffman also asked me to lend him a little money, with which he bought some clothing. A week or so afterwards I met an officer (naming the man), who asked me if I had lost my horse lately. I said I hadn't; but the officer then said he had seen a man with a mare just like mine, a few miles below Firth, which he offered to sell for $40. His suspicions were aroused, and he had a notion to arrest him. I asked him to describe the man, and it answered to Hoffman, and then I felt sure he had got away with my horse. Two or three weeks later I received a dispatch from Springfield, Missouri, saying Hoffman had been arrested and was held to my order. After thinking it over, I concluded not to prosecute him.

I wrote him to come back at once with the horse, and assured him I would not prosecute. He returned a week or two later, but without the horse. He was haggard in appearance, and threadbare in his clothes. He offered to give me a note for the horse, but would not tell me what he had done with him. I didn't want his note, but had him pay me in installments. He paid me $110 altogether, and then got me to sign a contract not to prosecute him in the courts. He has been behaving well ever since, but there is no telling what he might do. I was very much surprised that Dawes made him his secretary. I met Fleharty, the former secretary, and with whom I had served in the army, and asked him who was going to be his successor. He said, Hoffman. "Great God!" said I, "that fellow will get the governor into some trouble." Fleharty wanted to know why, and I told him the whole story.'

"The above was substantially the statement made by my informant yesterday afternoon, in the hearing of my friend, who had accompanied me. I have given it in detail, because I wanted to show that I am not in the habit of inventing such serious charges. That my motive in this instance cannot be impugned is obvious. The disclosures made since the state treasury burglary show that there has been a put-up job in collusion with the parties in the state house. My impression is that Hoffman is capable of being accessory, and he was just the man to influence Governor Dawes into committing an official blunder which reflects discredit upon his good conduct.

"(Signed)                E. ROSEWATER."

In *Finch v. Vifquain*, 11 Neb., 280, Judge LAKE, in writing the opinion of the court, defines a libel to be "malicious defamation of a person expressed otherwise than by words, as by writing, printing, figures, signs, or any other symbols, and that it is a malicious publication, expressed either in printing or writing or by signs or pictures, tending either to injure the memory of one dead or

the reputation of one alive and expose him to public hatred, contempt, or ridicule."

These definitions are taken from Brown's Law Dictionary, 208, and First Kent's Com., 629.

A part of that case was founded upon a publication that Finch "was an arch hypocrite and scoundrel, who was simply using his talents for money making purposes, and not through any sincerity in the cause in which he is laboring," referring to the temperance cause. These words were held *per se* actionable.

In the article referred to, in this case, the writer, in referring to the defendant in error and a previous article published concerning him, gives in a somewhat colloquial form a conversation between himself and others concerning that article, in which he represents himself as saying that defendant in error might come on with his libel suit or suits, that he was well fortified, that his witnesses were here, and that they were responsible and reliable. In another part of the article he represents himself as having said that he did not believe he had made any mistake in the man, that his informant was a reputable person, owning $40,000 or $50,000 dollars' worth of property, and stating that said informant had detailed to him the circumstances concerning the sale of a horse by the defendant in error, his arrest and cofinement in jail. It will be observed also that the remarks concerning the supposed complicity of defendant in error with the death of one Griffin and attempt to burglarize the state treasury, are reproduced in this article in a manner which might tend greatly to the injury of defendant in error, were he innocent of any connection with that transaction. There can be no doubt but that had the charges, insinuations, and inferences been presented in another form the article would have been libelous. That the article in the form given was equally so, it seems to us cannot be open to question; we therefore think the instruction was rightly given.

A number of questions are presented by the record which we think it not necessary to notice, as they will not likely arise upon another trial; we will therefore confine our attention to a few questions which in the opinion of the court require a reversal of the judgment; but before doing so it may be well to state that no question has been raised as to the first and third causes of action as alleged in the petition. They are conceded to be and are libelous, if untrue and published maliciously.

On the trial defendant in error was permitted to inquire as to the financial standing, or in other words the wealth, of plaintiff in error. To this plaintiff in error, by his counsel, objected, but his objection was overruled. And in the ninth instruction, given upon the request of defendant in error, the jury were instructed by the court, that in determining the amount of damages they should consider the wealth of the defendant, for the purpose of showing his standing in the community. In this we think there was error. The court very properly permitted testimony showing the circulation of the paper in which the articles were published, as well as the manner in which it was published and circulated; but it is the opinion of the court that any proof as to the wealth of the plaintiff in error could not have been properly admitted, and that that consideration should not have been submitted to the jury. It is a well settled rule, in this state, that punitive, vindictive, or exemplary damages cannot be allowed. The only damages recoverable are denominated compensatory, which are a satisfaction for the injury sustained. *Boyer v. Burr,* 8 Neb., 70. *Roose v. Perkins,* 9 Id., 315. *Riewe v. McCormick,* 11 Id., 263. *Boldt v. Budwig,* 19 Id., 739.

It was competent and proper, as tending to show the injury, for the jury to be informed of the extent of the publication.

It is shown by the pleadings and briefs that plaintiff in error is the editor-in-chief of the paper in which the libel-

ous articles were published. While it is true that the action is against him personally, yet it is apparent that the injury, if any, is caused by the wide circulation of the libel in the paper of which he was such editor. In the absence of the allowance of exemplary damages we are unable to see any reason for the submission of the question under consideration to the jury.

The publication alleged in the first cause of action as the basis of defendant's suit is as follows:

### "A LESSON TO GOVERNOR DAWES.

"Every citizen of Nebraska must feel mortified over the imprudent conduct of Governor Dawes in connection with the plot to rob the state treasury. The chief executive of this state has laid himself liable to indictment as an accessory to a cold-blooded murder. It is almost incredible how any man occupying such an exalted position could allow himself to be made the dupe and accomplice of a brace of cowardly villains. It is simply amazing that the governor of a great state should become a party, by his full knowledge and consent, to a plot dastardly in its very inception, and most cowardly in its execution. This is not the first time, however, that Gov. Dawes has showed a lamentable want of common sense, and we fear it will not be the last. The most charitable construction that can be put upon his conduct in this instance is that he is a very poor judge of men, and therefore may be readily imposed upon. But Governor Dawes cannot escape the responsibility for his own acts or the misconduct of his associates. When a man makes his bed with rogues, public confidence is very properly withdrawn. The most confidential associate of Governor Dawes, his private secretary, Milton S. Hoffman (meaning thereby this plaintiff), is a man with an infamous record. Not many years ago, he was lodged in a Missouri jail for horse stealing, and only escaped service in the penitentiary by the generosity of the owner of

the borrowed horse, who was induced to drop the prosecution. At another time, we are credibly informed, this confidential associate of His Excellency planned a safe burglary and sought to induce another man to join him in the enterprise. This may be a revelation to Governor Dawes, and will doubtless be a surprise to his man Friday, but the fact is very suggestive. Possibly Mr. Hoffman (thereby meaning this plaintiff), may be able to throw some additional light on the plot to rob the state treasury. Whatever the outcome may be, Governor Dawes will hereafter choose his companions and confederates with a little more care."

In this it may be seen, occurs the following language "Not many years ago he was lodged in a Missouri jail for horse stealing, but only escaped service in the penitentiary by the generosity of the owner of the borrowed horse, who was induced to drop the prosecution," etc.

Upon the trial defendant in error introduced a written agreement between himself and T. F. Barnes, the owner of the horse referred to in the published article, and which contract was as follows:

"Articles of agreement made and entered into by T. F. Barnes, of the first part, and J. M. Hoffman, of the second part, witnesseth, that said T. F. Barnes agrees to furnish one horse and pay all traveling expenses in the purchase of additional homestead claims by said J. M. Hoffman, and said J. M. Hoffman agrees to give all his time in traveling to purchasing said additional claims, and it is mutually agreed by and between said parties that all of said business shall be transacted through 1st National Bank of Lincoln, Neb. The claims to be sent to said bank and turned over to T. F. Barnes, for him to forward to U. S. Land Commissioner for approval, and when approved said claims are to be returned to said bank and to be forwarded to buyer, who shall pay the highest price known at the time of sale, and upon the return of proceeds

of sale of each claim the bank shall first take out their charges and take out all money advanced on said claim by said T. F. Barnes and commissioner's fees and pay to said T. F. Barnes, and shall then take out amount of purchase money (of said claim) yet due soldiers, and divide the balance equally between said T. F. Barnes and J. M. Hoffman, and amount of money due soldiers shall be sent to soldiers in df't in his name, and amount of profit due said J. M. Hoffman to be remitted to him by df't in his name or subject to his order.

"This contract shall be binding and in force for one year. Said Hoffman is to continue said work for one year, and said Barnes is to make sale of said claims to the highest bidder known to him at time of sale, and each mutually agree to forfeit ($1,000) one thousand dollars to the other as liquidated damages for violation of this agreement.

"Witness our hands and seal this 15th day of Dec., 1879.

"T. F. BARNES,<br>"J. M. HOFFMAN."

The court then instructed the jury, by its seventh instruction, in the following language:

"If you find from the evidence that one T. F. Barnes delivered the horse in question to the plaintiff in error, and by virtue of and in execution of the written contract made between plaintiff and Barnes, then you are instructed that such horse was partnership property and that any disposition plaintiff made of said horse was not, and in law could not be larceny, or, more plainly, horse stealing."

The objection to this instruction is, that the contract having been made between persons not parties to the record, and the same not being involved in any form in the suit in hand, it was not the province of the court to consider it, but that the whole question as to the rights of Barnes and defendant in error should have been left to the

jury. This, we think, is the correct rule. The rule is well settled that parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument, but this rule is applied only in suits between the parties to it. As between them, the contract must stand as written. But it should not be permitted to affect the rights of third parties, for as can be plainly seen, great injustice might result from the application of the rule as to them. This is clearly illustrated in the present case. Suppose the written contract had been such as to give defendant in error no interest in the property sold, and conferred upon him no right to dispose of it; that fact could not estop him, in a case like this, from proving the exact agreement, whether oral or written, under which he took it into his possession. The agreement was competent evidence to submit to the jury, but it was not competent for the court to construe it.

See 1st Greenleaf on Evidence, Sec. 279. *Borreda v. Silsbee*, 21 How., 146. *Etting v. Bank*, 11 Wheaton, 57.

For these errors the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.