## PAGE et al. v. UNITED FRUIT CO. et al.

(Circuit Court of Appeals, First Circuit. January 6, 1925. On Petition for Rehearing, March 9, 1925.)

No. 1771.

**1. Carriers ⬤⟿318(1)—Evidence held to warrant finding railroad in Costa Rica negligently failed to inform officers of troop train of harmless character of occupants of passenger train.**

Evidence *held* to warrant finding that trainmen and officers of troop train in Costa Rica were informed that passenger train was in hands of revolutionists, and that, though railroad should have anticipated that officers might believe train contained revolutionists, it negligently failed to inform them of harmless character of occupants of train until after passenger was shot.

**2. Carriers ⬤⟿284(2)—Passenger on train in Costa Rica held not to have assumed risk of being shot by soldiers searching for revolutionists.**

Passenger on train in Costa Rica did not assume risk of being shot by government soldiers, where neither passenger nor conductor knew that troop train contained government troops in search of revolutionists, and that troops believed revolutionists were on passenger train.

**3. Carriers ⬤⟿280(1)—Care required of railroad to passenger under law of Costa Rica stated.**

Under law of Costa Rica, it is railroad's duty to passenger to exercise care of good father or of reasonably prudent man, breach of which is not barred by limitation.

**4. Release ⬤⟿27—Release of Costa Rican government from liability for injuries to passenger shot by troops held not to release railroad.**

Plaintiff's acceptance of offer of Costa Rican government for compensation for being shot by government troops while passenger on railroad did not release railroad, regardless of whether he reserved right against it, under Civ. Code Costa Rica, § 642, since Costa Rican government is not solidary debtor, within section 642, and railroad cannot complain because plaintiff voluntarily consented to having his damages reduced.

**5. Evidence ☞424—Either party to controversy between strangers, or between one of contracting parties and stranger, may prove true transaction by parol.**

In controversies between strangers, or between one of contracting parties and stranger, either party may show true transaction by parol.

Johnson, Circuit Judge, dissenting.

On Petition for Rehearing.

**6. Abatement and revival ☞49—Survival of action governed by law of forum.**

Action brought in Massachusetts district for personal injuries survived plaintiff's death, under G. L. Mass. c. 228, § 1, notwithstanding action, if brought in Costa Rica, where injuries were sustained, would not have survived.

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Action by Donald Page and others, administrators, against the United Fruit Company and the Northern Railway Company. Judgment for defendants, and plaintiffs bring error. Judgment for defendant Railway Company vacated, verdict set aside, and case remanded, with directions. Judgment for defendant Fruit Company affirmed.

Charles F. Perkins, of Boston, Mass. (Paul F. Perkins, of Boston, Mass., on the brief), for plaintiffs in error.

Robert G. Dodge, of Boston, Mass. (J. M. Raymond, of Boston, Mass., on the brief), for defendants in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This was an action of tort brought by Michael B. Ryan, a citizen of Connecticut, against the Northern Railway Company and the United Fruit Company, New Jersey corporations having their usual places of business at Boston, Mass.; to recover damages for injuries sustained while a passenger on the Northern Railway Company's road in Costa Rica, Central America. The writ was dated January 15, 1921. The action was brought in the federal District Court for Massachusetts.

There were two trials in the District Court. At the first trial a verdict was directed for the United Fruit Company, and the jury disagreed as to the railway company. At the second trial, in answer to questions submitted by the court, the jury found specially (1) that the plaintiff was injured by the negligence of the defendant; and (2) that the plaintiff's damages were $35,000, less $10,000 which had been paid him by the Costa Rican government, and returned a general verdict for the plaintiff for $25,000. At the same time, at the direction of the court, they found for the defendant, if, as a matter of law, the plaintiff was not entitled to a verdict, and consented that a verdict might be entered on an order of the District Court for Massachusetts, or of the Circuit Court of Appeals, or of the Supreme Court, with the same effect as if returned by them.

On May 5, and within two days of the rendition of the verdict, the defendant filed a motion to set aside the verdict as not warranted in law, and asked that the alternative verdict for the defendant be entered in its place. A hearing having been had on the motion, the District Court, on September 6, 1923, entered an order setting the verdict aside and entering the alternative verdict for the defendant, subject to the plaintiff's exception.

The case was thereafter continued from term to term, when, at the December term, 1923, the death of the plaintiff being suggested and administration having been taken out, the administrators, Donald Page and H. Anton Bock, were made plaintiffs. A substituted bill of exceptions having been filed on March 12, 1924, on March 17, 1924, judgment was entered for the United Fruit Company and the Northern Railway Company, and this writ of error was prosecuted.

The errors relied on relate to the order of the District Court setting aside the verdict for the plaintiff and entering the alternative verdict for the defendant railway company.

The defendants in their answer, in addition to a general denial, pleaded three special defenses: (1) Assumption of risk; (2) that the plaintiff received the sum of $10,000 from the republic of Costa Rica as compensation for the injuries in question and gave a release to the said republic; and (3) that the plaintiff never had a cause of action under the law of the republic of Costa Rica, and, if he ever had, it was prescribed under said law.

[1] The principal question in the case is whether there was any evidence which warranted the jury in finding that the defendant was negligent—that through its representatives charged with the duty of operating its road it failed to use the care of the good father or of the average prudent man; a common carrier of passengers, under the law of Costa Rica, not being responsible for the highest degree of care.

Considering the evidence in the light most favorable to the plaintiff, it tended to show

the following: That at 8 o'clock in the morning of February 23, 1918, the plaintiff became a passenger on defendant's regular east-bound train from San José to Port Limon, Costa Rica, which was due to arrive at Limon at 4:30 that afternoon, where he intended to take a steamer the next day for New York. That on the day preceding February 23 an insurrection against the government broke out west of San José, which the government and railway officials regarded as of a trifling nature. That the train arrived at Turrialba about 11:30 in the forenoon of the 23d, where it was seized by a band of revolutionists and detained there until about 5:45 that afternoon, some of the revolutionists in the meantime having taken the engine and gone back west of Turrialba to destroy the track. That, after the engine was brought back, the passenger train, at about 5:45 p. m., with a number of the revolutionists still on board, proceeded easterly. That the next station reached east of Turrialba and some two or three miles distant therefrom was Torito. That at this point the revolutionists left the passenger train to go back and destroy the Torito bridge and the train proceeded on its way east to Peralta, a distance of three or four miles. That the head offices of the railway company were at Limon, where its general manager, superintendent, and chief assistant train dispatchers were located, and from which point orders were issued for the movement of trains. That there were telephone and telegraph lines connecting the head offices at Limon with the following stations west thereof, to wit: Turrialba; Peralta, a station some seven miles east of Turrialba; La Pascua, five or six miles east of Peralta; Las Lomas, five or six miles east of La Pascua; La Junta, some ten or twelve miles east of Las Lomas; and Siquirres, a short distance east of La Junta. That all the orders directing the movements of trains were made from Limon. That there were no means of communication from one station to another west of Limon. That all communications from such stations had to be to the head offices at Limon, which offices alone could communicate to the stations named west of it; that every station that was provided with lines west of Limon had an operator, except the stations at La Pascua and La Junta, which had booths. That the passenger train arrived at Peralta about 6 o'clock. That at Peralta word was received to pass an extra going west at La Pascua. That the passenger train proceeded east some five or six miles to La Pascua,

arriving there at about 7 o'clock, where it went upon a siding, so that the extra might pass, the road being a single track. That the extra coming west proved to be a train bearing government soldiers, sent in pursuit of the insurrectionists, and as the extra bearing the troops passed the passenger train the soldiers shot into the passenger cars and injured the plaintiff.

The conductor in charge of the passenger train was one Ramsey. He testified that while at Turrialba he called the head office at Limon, and informed it that the passenger train had been seized by revolutionists, and read a message prepared by some of the passengers of the train, which they desired telephoned to the American consul at Limon; that the head office declined to receive the message for transmission; that the message requested the consul's assistance in getting the train released from the insurrectionists, so that they might proceed. There was testimony that while the passenger train was held at Turrialba, and before the troop train left Limon, Ramsey notified Limon that the insurrectionists had concluded to release the train and permit it to proceed, but Ramsey did not testify that he gave Limon such information from Turrialba. He did, however, testify that when his train reached Peralta he telephoned Limon that the revolutionists had left the train at Torito and gone back to tear up the Torito bridge.

The head office at Limon, on receiving the information from Turrialba that the passenger train was in the hands of the revolutionists, informed the governor at Limon to that effect, and at 3:30 that afternoon a train was started from Limon bearing government troops bound for Turrialba in search of the insurrectionists.

Chittenden, the defendant's general manager, testified that before the troop train left Limon the trainmen and the commander of the troops were informed that the passenger train at Turrialba was in the hands of the revolutionists; that, when he received word of the release of the passenger train, he communicated that fact to the governor and told him he had better notify the troop train, and that he said he would, and afterwards that he did; that he (Chittenden) did not communicate to the trainmen of the troop train that the passenger train had been released, or that he knew there were women, children, and citizens of other countries among the passengers, but did direct the yardmaster at Siquirres to notify the agent at Las Lomas to inform the trainmen

of the troop train that women and children were among the passengers; that the governor had an extension of the United Fruit Company's telephone line in his office, which permitted him to call up Siquirres; and that the troop train, as he remembered, was at that time between Limon and Siquirres. There was also evidence that the troop train left Siquirres at 5:30 and reached Las Lomas about 6 p. m. or a little earlier, and that that place was five or six miles distant from La Pascua, where the trains later met, at the time the accident took place.

The defendant contends that it had no reason to anticipate that the soldiers on the troop train would think that the passenger train contained revolutionists and fire upon it, and that, in any event, it took every reasonable precaution to protect the passengers from such action. But we think the jury might reasonably find on the evidence, particularly in view of the testimony that the trainmen and officers of the troop train, before leaving Limon, were informed that the passenger train was in the hands of the revolutionists at Turrialba, that the defendant had reason to anticipate that the trainmen and officers of the troop train, on coming upon the passenger train, might believe that the passenger train contained revolutionists, and that, in view of this situation, they were bound to take such steps as reasonable prudence required for the protection of the passengers. The defendant says that it took such steps; that, as above pointed out, it notified the governor to inform the troops that the revolutionists had left the passenger train, and that the governor said that he would, and later that he had; and it seeks to carry the inference that he did so by communicating over his private phone to the troop train at Siquirres. But, on the evidence, we think that it was open to the jury to find that the offices at Limon did not receive word that the revolutionists had left the passenger train until after 6 o'clock, when that train reached Peralta, and that at that time those in charge at Limon must have known that the troop train had left Siquirres some half an hour or more before; that they also must have known that the governor could not then reach the troop train over his private phone, or over any telephone line except that of the defendant (which was not claimed that he did), and that no such communication was made by the governor to the troops; and that the testimony of Chittenden that he caused the yardmaster at Siquirres to communicate with the agent at Las Lomas

that women and children were on the passenger train could likewise have been disregarded, for there was testimony that the agent at Las Lomas could not be reached over the company's wires, except from Limon.

Powers, the chief train dispatcher at Limon, testified that he was in the train dispatcher's office at 5:30, and remained there with his assistant, Dingledine, until after the accident occurred; that he was present when Dingledine telephoned the orders as to the meeting of the passenger and troop trains at La Pascua; that the order to the passenger train was, "Engine 38 run Peralta to Siquirres as an extra; meet special west engine 48 at Pascua;" and that the order to the troop train was "Engine 48 run Siquirres to Peralta as a special to meet extra east engine at Pascua."

Dingledine, the assistant train dispatcher, testified that he got a message from Ramsey from Peralta which read, "All the rebels have gotten off the train at Torito, with the intention of destroying the bridge and disconnecting the track;" that after getting that message he sent a communication to the agent at Las Lomas for the conductor of the troop train as to meeting the passenger train; that the message read something like this, "Put out train order to meet the train at Pascua," and that "special 38 east has no revolutionists on the train"; that he also sent a message to Siquirres for the conductor of the troop train, saying that the "passenger train has been released and I will give you meet orders later;" that the orders he sent were in writing, but that he had none of them with him. Then later he testified that the agent at Las Lomas would write the message out as any ordinary telephone message and deliver it to the conductor, with the train orders in the same manner; that he, as dispatcher, kept nothing in writing.

Marsh, the superintendent, testified that train orders were issued in writing; that records of the orders for train movements were kept in the train dispatcher's office; that the train dispatcher's duties were to make notes of anything that affected train service in any way.

Ramsey testified that at Peralta he received a train order to meet the special west at La Pascua, and that he left a message there advising the head office that Torito bridge would be obstructed; that some of the revolutionary forces got off there, and that he had left the revolutionists at Torito.

From the foregoing evidence it appears

that Powers, the chief train dispatcher, testified that the order to the troop train was, "Engine 48 run Siquirres to Peralta as a special to meet extra east engine at Pascua," and that Dingledine, his assistant, testified that that message also contained a statement that "special 38 east has no revolutionists on the train." Because of this discrepancy in their testimony, it was for the jury to say whether the chief or the assistant dispatcher was correct as to what the message embodying the order contained, and in view of the testimony of Marsh that a record of orders affecting train service was kept in the train dispatcher's office at Limon, and that it was the duty of the train dispatcher to keep records of anything that affected train service in any way, and that Dingledine testified that he did not keep records of such orders, it was open to the jury to disbelieve the testimony of Dingledine, and find that the orders communicated by him to Las Lomas and Siquirres did not contain the information that there were no revolutionists on the east-bound or passenger train, and that, if the messages had contained the information, the defendant would have produced the written record of the orders which the train dispatcher was required to keep at the Limon office, which it did not do.

Inasmuch as the officers of the troops and the men in charge of the troop train had been informed by the defendant's general manager that the passenger train at Turrialba was in the hands of the revolutionists, and knew that La Pascua, where the trains were to pass, was only about twelve miles distant from Turrialba, and as the defendant had reasonable grounds to anticipate that the trainmen and officers in charge of the troops might understand that the oncoming passenger train contained armed enemy forces, unless informed by the governor and those in charge at Limon that no enemy forces were on the passenger train, and as the jury might find that no such warning was given to the officers of the troops or to the trainmen by the governor or those in charge at Limon, the question reduces itself to whether, in the absence of such information from these sources being given, and in view of all the other evidence in the case, including what transpired at La Pascua on the meeting of the trains, no other conclusion could reasonably be drawn than that the defendant was free from fault.

As above stated, the evidence shows that the passenger train reached La Pascua at about 7 o'clock and went upon the siding to await the coming of the west-bound train; that Ramsey, the conductor of the passenger train, on arriving at La Pascua, was unaware that the west-bound train bore government troops; that, after waiting there some five minutes, the west-bound train appeared and stopped its engine about opposite the engine of the passenger train; that Ramsey went forward and was heard to speak with one of the officers of the troops; that two witnesses testified that he said that there were no revolutionists on the passenger train; that he then gave the signal for the passenger train to go forward, but that the officers of the troops ordered him to stop; that the passenger train consisted of an engine, two or three freight cars, a combination baggage and passenger car, one or two coaches, and a pay car, carrying express and money, arranged in the order named; that the troop train was started, and as it moved along the barrels of the rifles of the soldiers could be seen in alignment extending from the windows of the troop train in the direction of the passenger train; that as the troop train drew opposite the combination baggage and passenger car an officer gave an order to fire, which the soldiers obeyed; that the firing continued, and when the cars containing the troops came opposite the passenger cars the troop train was suddenly brought to a standstill; that numerous shots were discharged into the open windows of the passenger train, out of which, prior to the shooting, passengers had been looking. The result was that several of the passengers were killed and others wounded, including the plaintiff, who was seriously injured. There was evidence that some of the soldiers on the steps of the platform of the troop train could have seen women and children at the windows of the passenger cars as the troop train approached, "but that the bulk of the soldiers couldn't see anything over a square equal to one window, because they were sighting right along their guns, and that they were sighting at the time that they came in sight of this train."

The record does not show that Ramsey testified as to what he said to the officers of the troops, but it does appear that he testified that "when the firing began he hollered several times to the troops that they were firing at passengers; that there were no revolutionists on board."

It is evident that the troops and their officers believed that the passenger train contained revolutionists—otherwise, it is prac-

tically impossible to account for their action—and the jury might have found that, inasmuch as Ramsey, the conductor, did not testify as to what he said to the officers in charge of the troops prior to the shooting, but did testify that when the shooting began he cried out that there was no revolutionists on the train, nothing of the kind was said until after the shooting began; that the troops and their officers never received any information as to the harmless character of the occupants of the train, or received it too late and under such circumstances as to render it unavailable.

We think the case was properly submitted to the jury; that it could not be said that there was no evidence from which it might reasonably be found that the defendant was negligent and that its negligence was the cause of the plaintiff's injury.

[2] Neither can it be said that the plaintiff assumed the risk, for the evidence shows that neither he nor Ramsey, the conductor, until they reached La Pascua, knew, or had any reason to know, that the west-bound special contained government troops in search of the revolutionists, and that the troops believed that the revolutionists were on the passenger train.

[3] The evidence introduced at the trial relating to the law of Costa Rica shows that it was the defendant's duty to the plaintiff to exercise the care of a good father, or that of a reasonably prudent man, and that, for a breach of this duty, the plaintiff had a right of action which was not barred by limitation, as the limitation relied upon applied to actions of contract and not of tort.

[4] It also appears that the plaintiff's acceptance of the offer of the Costa Rican government, under which he received the $10,000 from that government on account of the injuries sustained at La Pascua, was not to take effect until his acceptance reached the Costa Rican government, and that the resulting contract is to be interpreted according to the law of that country; that, under the law of that country, a creditor means a person who can exact, and a debtor one from whom an exaction can be made; that, while the republic of Costa Rica could be sued for a wrong committed by it, a judgment against it would not be enforceable by execution or ordinary process, but only upon the government's voluntarily providing means for its satisfaction, and that therefore the republic of Costa Rica was not a solidary debtor, whose release from liability would, under its law, absolve

the defendant; and that this was so, without regard to whether the plaintiff, at the time he gave the release, reserved his right against the defendant under article 642 of the Code.

[5] It is further argued by the defendant that if the plaintiff, in giving his release to the Costa Rican republic, reserved his right against the defendant—and it is conceded that he did according to the understanding of the parties at the time the release was given, although it was not expressly so stated—the plaintiff, under articles 756 and 757 of the Civil Code of Costa Rica, provisions declaring the equivalent of our parol evidence rule, could not introduce parol evidence to show that such reservation was made. The defendant, however, was not a party to the release, nor does it claim under any right of Costa Rica. It was a stranger, and in controversies between strangers, or between one of the contractors and a stranger, either party may show by parol what the true transaction was. Barreda v. Silsbee, 21 How. 146, 165–170, 16 L. Ed. 86; Libby v. Spring & Land Co., 67 N. H. 587, 588, 32 A. 772. But we regard this branch of the discussion as immaterial. The republic of Costa Rica was not a solidary debtor, within the meaning of article 642 of the Code of Costa Rica, as the plaintiff could not enforce a judgment against it, if obtained. And the defendant cannot complain because the plaintiff voluntarily consented to having his damages reduced to the extent of $10,000.

The plaintiffs in error have waived their exception to the action of the District Court in directing a verdict for the United Fruit Company, and, if they had not, we are of the opinion that the verdict as to that company was properly directed.

The judgment of the District Court in favor of the Northern Railway Company is vacated, the verdict in its favor is set aside, and the case is remanded to that court, with directions to enter a verdict and judgment for the plaintiffs in error as to it, with costs.

The judgment of the District Court in favor of the United Fruit Company is affirmed, with costs.

JOHNSON, Circuit Judge (dissenting). I am unable to reach the conclusion that there was any evidence in the case to sustain the verdict. In order to sustain his action it was necessary for the plaintiff to prove that the railway company knew that the commander of the troops had reasonable cause to believe that the revolutionists were

on the passenger train when it was met by the troop train at La Pascua. There was no evidence that the defendant knew that the revolutionists were on the passenger train when it left Turrialba. On the contrary, there was evidence that the defendant's general manager and its superintendent had received a communication from the conductor of the passenger train, which he sent or caused to be sent from Turrialba, stating that the revolutionists had surrendered the train, and that this information had been given to the governor of Limon and his permission obtained to move the passenger train from Turrialba. Obviously the governor knew that the revolutionists had surrendered the train before it left Turrialba, which it did, as testified by the plaintiff and the conductor, about 5:30 p. m., and by the train dispatcher, between 5:30 and 5:45 p. m. How long before the train left Turrialba the governor was notified the evidence does not disclose.

Dingledine, the assistant train dispatcher, testified that he received a communication to this effect from Ramsey at Turrialba about 5:15 p. m., immediately after he went on duty, which was at 5 p. m., and that he at once notified the superintendent.

If it can be said that, under all the circumstances, it was the duty of the defendant to notify the troops that the revolutionists had surrendered the passenger train, this duty was discharged when the governor was notified. The troops had been dispatched under his direction, and their commander was subject to his orders, and not to those of the officers of the railway company.

It appears from the evidence that the governor had access to the telephone in the dispatcher's office at Limon and had used it during that day; that he also had access to another line. If any necessity existed for notifying the troops that there were no revolutionists on the passenger train, the railway officials had a right to assume that the governor had performed his duty and notified them, as he said he had.

There was nothing about the appearance of the train which was different from that of an ordinary combination freight and passenger train, and the fact that orders were given from the railroad offices at Limon to the troop train at Las Lomas to cross an east-bound special at La Pascua was in itself sufficient to notify the troop train that the special which it was to meet was not a hostile train. The whole situation, as developed by the evidence, was one which furnished no basis for any finding by the jury that the defendant knew that the troops had reasonable grounds to believe that this passenger train was carrying revolutionists when met at La Pascua. There was undisputed evidence that when the troop train arrived at La Pascua the officers in charge of the troops received information that there were no revolutionists aboard the passenger train. When the engine of the troop train was opposite the engine of the passenger train the conductor of the latter, who was standing upon the ground between the two trains, flagged the oncoming troop train, and told the engineer that the revolutionists had destroyed a bridge near Torito. Two officers then alighted from the troop train, and one of them inquired of the conductor what the train upon the siding was, and was told that it was the regular passenger train from San José to Limon. A witness for the plaintiff, who was standing near by, testified that the conductor told this officer, both in English and in Spanish, that there were no revolutionists aboard the passenger train.

Vietch, a witness for the defendant, a consular agent of the Italian government, who was also there, testified that he was asked by the other officer what the train on the siding was, and he told him that it was the passenger train from San José to Limon, and that it had no revolutionists aboard.

The record contains only an abstract of the testimony, and the questions of the officer which drew out this information are not given; but presumably they were given in answer to inquiries of the officers whether there were any revolutionists aboard the passenger train. The officers evidently did not believe the statements of the conductor and the other party, and when the conductor of the passenger train ordered his train to move along the siding they ordered it to stop, and the troop train was started. When the cars of the troop train came opposite the two coaches of the passenger train, one of these officers raised his sword and gave the command to fire. The windows of the coaches of the passenger train were open, and there was evidence that several passengers, women among them, could be seen looking out of the windows when the firing began, and that one woman was killed who was looking out of a window.

The consular agent who was standing between the two trains received one or two bullets through his clothing, and escaped further injury by diving under one of the coaches of the passenger train. As a re-

sult of this shooting 15 or 20 passengers in the passenger train were wounded and 4 or 5 killed. Among the wounded was the plaintiff.

There was uncontradicted evidence that this shooting occurred at about 7 p. m., when there was perfect visibility for a distance of 200 feet. There was no armed person on or about the passenger train, and there was nothing about its appearance to create a suspicion, certainly not a reasonable belief, that it had armed revolutionists aboard. It is evident that the exercise of the slightest degree of caution would have satisfied the officers in charge of the troops that the statements of the conductor and of the Italian consular agent were true.

I cannot escape the conclusion that the verdict of the jury that the defendant was guilty of negligence under the law of Costa Rica was not sustained by the evidence, and that the District Court did not err in setting it aside.

### On Petition for Rehearing.

PER CURIAM. This is an application (1) for rehearing; (2) for an enlargement of the transcript of record, on the ground that certain evidence introduced at the trial has been omitted; and (3) for a modification of our mandate, so that the defendant may apply to the District Court for the purpose of showing that under the law of Costa Rica the right of action did not survive, and that the administrators of the plaintiff's estate were improperly admitted to prosecute the cause.

1. As no member of the court who concurred in our decision of January 6, 1925, desires a rehearing, it is denied.

2. As to enlarging the record, we will say that we have examined the affidavit attached to the defendant's application, and said to contain the omitted testimony; that it there appears that Ramsey testified that what he said to the officer of the troop train—"that his train was the regular passenger train, without any revolutionists on board"—was not said until after the trains were moving past one another; and that the order to the troops to fire was given at substantially the same time and while the troop train was still moving along. If the record were enlarged as desired, we are of the opinion that it would not alter the conclusion reached in our decision of January 6.

[6] 3. We are also satisfied that there is no occasion for a modification of our mandate on the ground suggested. The action was brought in the Massachusetts district to recover damages for personal injuries. After the completion of the trial in the District Court, the plaintiff died, and his administrators were permitted to appear, without objection, and further prosecute the action. The contention of the defendant with reference to this matter is that the plaintiff left no heirs in the ascending or descending line, and that, such being the case, by the law of Costa Rica, where the accident occurred, the action did not survive. But by the law of Massachusetts, where the action was brought, the right of action survived. Gen. Laws Mass. c. 228, § 1. The right to revive the action is not affected by the fact that the plaintiff received his injuries in Costa Rica. The action having been brought in the Massachusetts district, the right to revive it is governed by the law of Massachusetts, not by that of Costa Rica.

In Baltimore & Ohio R. R. Co. v. Joy, Admr., 173 U. S. 226, 228, 19 S. Ct. 387, 388 (43 L. Ed. 677), the Court of Appeals for the Sixth Circuit certified the following question to the Supreme Court: "Does an action pending in the Circuit Court of the United States sitting in Ohio, brought by the injured person as plaintiff to recover damages for injuries sustained by the negligence of the defendant in Indiana, finally abate upon the death of the plaintiff, in view of the fact that, had no suit been brought at all, the cause of action would have abated both in Indiana and Ohio, and that, even if suit had been brought in Indiana, the action would have abated in that state?" The answer was that it did not.

See, also, Martin v. Wabash R. R. Co., 142 F. 650, 73 C. C. A. 646, 6 Ann. Cas. 582; Van Choate v. General Electric Co. (D. C.) 245 F. 120, 121; Wing v. McCallum (C. C. A.) 292 F. 810.

Petition denied.