**MODOC COUNTY BANK (Formerly Bank of Ft. Bidwell) v. RINGLING et al.**

(Circuit Court of Appeals, Ninth Circuit. August 3, 1925. Rehearing Denied Sept. 14, 1925.)

No. 4426.

**1. Appeal and error ⬅═237(4) — Motion for nonsuit must be renewed at close of all the evidence to preserve exception to its refusal.**

Under District Court Rules, rule 92, a motion for nonsuit must be renewed at close of all the evidence, in order to preserve an exception to its refusal.

**2. Appeal and error ⬅═949—Whether findings of court without a jury shall be special or general is discretionary.**

Where jury trial is waived, whether findings of the court shall be special or general is discretionary with the trial court, and is not reviewable on appeal.

**3. Banks and banking ⬅═67—Bank purchasing bankable assets of another held to have succeeded to its liabilities.**

In view of California Banking Act, § 31, as amended by St. Cal. 1921, p. 1373, § 15, bank, which has purchased all the bankable assets of another, held to have succeeded to its liabilities.

**4. Banks and banking ⬅═99—Bank's guaranty of fulfillment of contract of depositor held not ultra vires.**

Bank's guaranty to repay buyer of lambs from one of its depositors for advances on all lambs which depositor failed to deliver according to contract held not ultra vires, but an ordinary business transaction between a bank and its depositor.

**5. Evidence ⬅═413—Evidence is admissible to show the subject-matter and surrounding circumstances of contract.**

Where bank guaranteed to repay buyer of lambs from one of its depositors for advances on all lambs which were not delivered according to contract, evidence that when guaranty was made bank had already advanced to its depositor money required to make payments held admissible as showing subject-matter and surrounding circumstances of contract.

In Error to the District Court of the United States for the Southern Division of the Northern District of California; Frank H. Rudkin, Judge.

Action by Richard T. Ringling and others against the Modoc County Bank, formerly the Bank of Ft. Bidwell. Judgment for plaintiffs, and defendant brings error. Affirmed.

Action at law: Action for money had and received, to recover the sum advanced by plaintiffs and paid to the Alturas State Bank, the predecessor of the defendant, for purchase of lambs, under a guaranty by the Alturas State Bank to repay the amount advanced and paid to said bank upon failure to deliver, to the extent of such failure. In a separate count in an amended complaint, the cause of action is stated in ordinary and concise language, as provided in section 426 of the California Code of Civil Procedure.

Sullivan & Sullivan and Theo. J. Roche, of San Francisco, Cal., for plaintiff in error.

Dunne, Brobeck, Phleger & Harrison and J. Elliott Cook, all of San Francisco, Cal., for defendants in error.

Before GILBERT, HUNT, and MORROW, Circuit Judges.

MORROW, Circuit Judge. Plaintiff in error, a California banking corporation, was defendant in the court below. Defendants in error are citizens of Montana, and were plaintiffs in the court below. For convenience they will hereinafter be designated as plaintiffs and defendant, as in the lower court.

Plaintiffs were copartners in 1922, engaged in the buying and selling of sheep and lambs.

The cause of action was for money had and received in 1922 by the Alturas State Bank to recover from the defendant, the successor of said bank, the sum advanced by plaintiffs and paid to the Alturas State Bank for the purchase of lambs by one C. T. Carter, under an agreement in writing by defendant's predecessor, dated May 27, 1922, to repay the amount so advanced and paid to the said predecessor upon a failure by Carter to deliver the lambs to plaintiffs in accordance with the terms of the agreement to the extent of such failure on the part of Carter.

In a separate count in an amended complaint the cause of action is stated in ordinary and concise language as provided in section 426 of the California Code of Civil Procedure.

The agreement with Carter, as set forth in the complaint, called for the delivery by Carter of approximately 32,500 head of lambs. It is alleged that plaintiffs, by way of advance payment, paid to the Alturas State Bank, defendant's predecessor, the sum of $24,800 as initial payment for 22,-700 head of lambs at the rate of $1.09¼ per head.

It is alleged that it was further agreed on the part of the plaintiffs to purchase certain other lambs from Carter, and immediately pay to the Alturas State Bank, for account of said Carter, the sum of $1 per head for such lambs, and the bank guaranteed and agreed to repay to plaintiffs the said sum of $1 per head for each and every head that Carter might fail or be unable to deliver.

It was further alleged that, in the event Carter should fail to deliver said lambs, the bank would repay to plaintiffs the amount of such advance payment to the extent of such failure; that Carter delivered 6,286 lambs; that by reason of the premises the Alturas State Bank became indebted to plaintiffs prior to November 1, 1922, in the sum of $27,732.54 for such undelivered lambs.

It appears that, at the time this agreement was made, William Rea, Jr., representing the plaintiffs, received from Carter and one A. Hafer, the cashier of the Alturas State Bank, copies of eight agreements entered into between the several growers of the lambs and Carter, wherein it was agreed in writings in similar form by the several growers for the consideration named to sell and deliver to Carter, at a date named, a specified number of lambs at an agreed price per head. The total of these agreements called for 22,700 head of lambs.

It appears further that Carter delivered to plaintiffs 6,286 lambs, and no more, upon which and other undelivered lambs plaintiffs had made initial payments to the Alturas State Bank of $1.09¼ per head. The suit was to recover from the defendant, the successor of the Alturas State Bank, and the guarantor of Carter's agreement, the sum of $27,732.54, the amount of the initial payment paid by the plaintiffs to the Alturas State Bank and received by the bank from the plaintiffs for such undelivered lambs.

The case was tried by the court without a jury, upon a written stipulation filed with the clerk; a jury trial having been waived by the parties.

[1] At the close of the testimony in behalf of the plaintiffs, defendant made a motion for a nonsuit, which was denied by the court, to which ruling the defendant noted an exception.

Thereupon the defendant introduced evidence by way of defense. The plaintiffs followed with evidence in rebuttal, and the case was closed. Motion for a nonsuit was not renewed at the close of the case, and no motion was made by defendant that the court should dismiss the action and enter a judgment in favor of the defendant, on the ground that the allegations of plaintiffs' complaint had not been established, or that the evidence was not sufficient to support a judgment in favor of the plaintiffs, or that the evidence required a judgment in favor of the defendant.

In the transcript of the record there is this statement of the proceedings in this behalf: "The motion for nonsuit was not renewed at the conclusion of the hearing. Plaintiffs therefore contend that the motion was waived. Upon the conclusion of the trial, briefs in writing were submitted by both parties setting forth their respective contentions. In the brief filed on behalf of the defendant, it was asserted and claimed, among other things, that the evidence introduced upon the trial was not sufficient to warrant any judgment being rendered or entered in favor of the plaintiff. This contention was refuted in the briefs filed on behalf of the plaintiff. In support of their respective positions, authorities were cited in each of said briefs. (Said briefs contained no specific reference to the matter of nonsuit or to any motion therefor.)"

Rule No. 92 of the practice in the District Court of the United States for the Northern District of California provides that "the defendant in an action at law, tried either with or without a jury, may either at the close of the plaintiff's case or at the close of the case on both sides, move for a nonsuit."

Then, after providing the procedure on such a motion, and requiring that the ground of such motion shall be stated specifically, the rule provides: "The party against whom the decision on the motion is rendered may then and there take a general exception, and may have the same, together with such of the proceedings in the case as are material, embodied in a bill of exceptions. If evidence shall be introduced by either party after the decision on the motion has been made, the same shall operate as a superseding of the motion; but such motion may be renewed at the close of all the evidence."

[2] The failure to renew the motion of nonsuit at the close of all the evidence operated under the rule to supersede the motion of a nonsuit at the close of plaintiffs' case. The court made a general finding in favor of the plaintiffs and against the defendant. Prior thereto there was a request made by counsel for the defendant to counsel for plaintiffs that the former wished special findings, and this request was communicated to the court. The court was of the opinion that it was not a case for special findings, and, because the rule respecting special findings had not been followed by either party, the court exercised its discretion and refused special findings.

In Dirst v. Morris, 14 Wall. 484, 491 (20 L. Ed. 722), Mr. Justice Bradley, speaking for the Supreme Court, said: "Had there been a jury, the defendant might have called upon the court for instructions, and thus raised the questions of law which he deemed material. Or, had the law, which authorizes the waiver of a jury, allowed the parties to require a special finding of the facts, then the legal questions could have been raised and presented here upon such findings as upon a special verdict. But, as the law stands, if a jury is waived, and the court chooses to find generally for one side or the other, the losing party has no redress on error, except for the wrongful admission or rejection of evidence."

Whether the findings shall be special or general rests in the discretion of the trial court, and this discretion is not reviewable on appeal. Bank of Waterproof v. Fidelity & Deposit Co. (C. C. A.) 299 F. 478, 480; Compania Trans. De Petroleo v. Mexican Gulf Oil Co. (C. C. A.) 292 F. 846, 848, and the cases there cited. See, also, Pennsylvania Casualty Co. v. Whiteway, 210 F. 782, 784, 127 C. C. A. 332; Sierra Land & Live Stock Co. v. Desert Power & Mill Co., 229 F. 982, 984, 144 C. C. A. 264; Maryland Casualty Co. v. Orchard Land & Timber Co., 240 F. 364, 366, 153 C. C. A. 290; Rajotte-Winters Co. v. Whitney Co. (C. C. A.) 2 F.(2d) 801.

It follows that the scope of this review is limited to questions of law and to errors assigned in the wrongful admission of evidence. This limitation is not, however, very important in this case, since the essential elements of the controversy are involved in the construction of two contracts—the interpretation of a statute of the state, and incidentally the admission of evidence over the objection of the defendant.

[3] The plaintiffs introduced in evidence an agreement, a copy of which was attached to defendant's amended answer dated March 15, 1923, between the Alturas State Bank and the Bank of Ft. Bidwell, both banking corporations organized and existing under the laws of the state of California; the former having its principal place of business in Alturas, Modoc county, and the latter at Ft. Bidwell in the same county. The latter bank has since become the Modoc County Bank, and is the defendant herein.

The agreement provided, among other things, that the Alturas State Bank would sell and transfer to the Bank of Ft. Bidwell, and the latter would purchase, upon the terms and conditions specified in the agreement, the bankable assets of said Alturas State Bank, designated in the agreement. It was expressly understood and agreed that the agreement was made and entered into under the provisions of section 31 of the Banking Act of the state of California. (Stats. Cal. 1921, Extra Sess. 1919, pp. 1373–1376.) This act provides, among other things, preliminarily, that: "Any bank may sell the whole of its business or the whole of the business of any of its departments to any other bank which may purchase such business after obtaining the consent of the stockholders of the selling and of the purchasing banks holding of record at least two-thirds of the issued capital stock of each of such corporations; such consent to be expressed either in writing executed and acknowledged by such stockholders and attached to the instrument of sale, or to a copy thereof, or by vote at a stockholders' meeting of each of such banks called for that purpose. The selling and purchasing

banks must for such purposes enter into an agreement of sale and purchase, which agreement shall contain all the terms and conditions connected with such sale and purchase. Such agreement shall contain proper provision for the payment of liabilities of the selling bank or of the department sold, and the assumption by the purchasing bank of all fiduciary and trust obligations of the selling bank or department sold, and in these particulars shall be subject to the approval of the superintendent of banks; and shall not be valid until such approval is obtained."

It is further provided: "The rights of creditors of the selling bank shall not in any manner be impaired by any such sale, nor shall any liability or obligation for the payment of any money due or to become due, or any claim or demand, in any manner, or for any cause existing against such selling bank or against any stockholder thereof, be in any manner released or impaired, and all the rights, obligations and relations of all the parties, creditors, depositors, trustors and beneficiaries of trusts shall remain unimpaired by the sale, but such bank to which the other shall sell all its business or all the business of any of its departments, shall succeed to all such relations, obligations, trusts and liabilities and be held liable to pay and discharge all such debts and liabilities and to perform all such trusts of the selling bank in the same manner as if such bank to which the other had sold had itself incurred the obligation or liability or assumed the relation of trust, and the stockholders of the respective corporations so entering into such agreement shall continue subject to all the liabilities, claims and demands existing against them as such at or before such sale."

The agreement of sale and purchase of March 15, 1923, recites that the Alturas State Bank has been engaged in commercial banking business in the town of Alturas until about the 3d day of November, 1922, at which time the state superintendent of banks took charge of said bank, for the reason that its condition was considered unsound for the transaction of its business, and since that time the said Alturas Bank and the officers and stockholders thereof had been unable to rehabilitate said bank in manner satisfactory to the said superintendent of banks, and conditions were such that it appeared that the best means for adjusting the affairs of said Alturas State Bank would be for the said bank to sell and transfer all of its bankable assets to some other banking institution, and for such other banking institution to assume and pay the depositors of the said Alturas Bank.

The approval of the chief deputy superintendent of banks is in the record, and reads as follows: "The foregoing agreement of purchase and sale is hereby approved as far as is required by the provisions of section 31, of the Bank Act, this 28th day of April, 1923."

Attached to said contract was the consent to such contract and its execution, signed and executed by the stockholders of the said Alturas State Bank and said Bank of Ft. Bidwell. There is also in the record a document entitled "Statements and Schedules of Account Covered by Agreement of Purchase and Sale between Bank of Ft. Bidwell and Alturas State Bank," in so far as it was material to this controversy. These statements and schedules of account were not produced or offered as having been taken from the books and records of the Alturas State Bank, but as being covered by the agreement of purchase and sale agreed upon between the Bank of Ft. Bidwell and the Alturas State Bank.

In the transcript of record, it is stated that under the title of individual deposits was listed the name of each depositor of the Alturas State Bank, together with the amount due from said bank to said depositor. In this list were named 631 depositors, and the total deposits were $80,373.65. The record recites that "neither said C. T. Carter nor any of the plaintiffs herein was named among said depositors, nor did said list or schedule disclose that any money had been deposited by any of said persons with said bank of Alturas, or that any sum was due from said Alturas State Bank to said C. T. Carter, Richard T. Ringling, Lester P. Work, William Rea, Jr., or any of said persons."

The record further recites: "In no part of said statement or schedule was the name of said C. T. Carter or any of the plaintiffs mentioned or referred to, nor did said statement or schedule state or disclose that there was any sum of money or any liability of any kind due or owing from said Alturas State Bank to said C. T. Carter or any of the plaintiffs herein."

Both of these recitals are misleading, if they were introduced for the purpose of showing or tending to show that prior to November 3, 1922, neither C. T. Carter nor any of the plaintiffs were depositors in the Alturas State Bank, or that prior to such date there was not any sum of money or any

liability of any kind due or owing from said Alturas State Bank to said C. T. Carter, or any of the plaintiffs. They neither show or tend to show anything of the kind. They are mere recitals that the schedules of accounts covered by the agreement between the Bank of Ft. Bidwell and the Alturas State Bank do not contain such business details. That Rea, representing the plaintiffs, and Carter were depositors in the bank is stated and fully explained in the evidence.

A. Hafer was the principal owner, cashier, and manager of the Alturas State Bank. He was a witness for the defendant at the trial. He testified concerning the conference between the parties that preceded the making of the agreement of May 27, 1922. He said that: "During the course of those negotiations they [referring to plaintiffs] said they wanted some kind of guaranty that the lambs would be delivered according to contract. They said that they wanted the Alturas State Bank to give them a guaranty instead of myself. I had previously given them a guaranty."

On cross-examination he testified that: "I had known Carter since 1914. He was a depositor in the bank prior to May 27, 1922, and on that date had an account there. He had money in that account to his credit on May 27th, over and above Mr. Rea's draft—how much, I don't know. He had as much as a couple of hundred dollars, I guess, and maybe more. On May 27, 1922, his balance was $46,659.79, in which was included the draft of $46,400, which had been deposited to his credit. Between May 11 and May 27, 1922, I had paid some of Carter's checks, but the amount I do not know."

The agreement between C. T. Carter, the plaintiff Rea, and the Alturas State Bank, dated May 27, 1922, was signed on behalf of the bank by A. Hafer, cashier. The agreement states the transaction between the parties here in controversy, with the necessary business detail. It states that Rea was then advancing to Carter the sum of $24,800 on account of the purchase of 22,700 head of lambs, which money was to be paid to the Alturas State Bank, and the bank, in consideration of the covenants and agreements between Carter and Rea, and in consideration of the payment of $24,800 by Rea to the bank for Carter, guaranteed and agreed with Rea that, in the event that Carter should fail or should be unable to deliver to Rea the said lambs, then, in such event, the bank contracted, agreed, and guaranteed to refund to Rea the sum of $1.09¼ per head for each and every one of the said

22,700 lambs which said Carter failed or was unable to deliver to Rea. The agreement provided further with respect to other lambs described in the agreement, for which advance payments were to be made by Rea to the bank for Carter at the rate of $1 per head, and a like guaranty on the part of the bank to repay to Rea the sum of $1 per head for each and every lamb undelivered by Carter.

The court below was of the opinion that the defendant bank had succeeded to all liabilities of the Alturas Bank under the law of this state, by reason of its purchase of all the bankable assets of the latter. In so far as this was a question of fact, the finding of the lower court is covered by the general finding of the court in favor of the plaintiffs, and is not open to review here. In so far as it is a question of law, we concur in the opinion of the lower court.

It is inconceivable that a bank in an unsound condition, as the Alturas State Bank was, or in any condition, can, by an agreement with another banking institution, either with or without the approval of the state bank commissioner, sell and transfer all of its bankable assets to such other banking institution, and thereby eliminate its liability to those with whom it has had business relations, or thereby escape its obligations to creditors, depositors, and trustors, and we find that the statute hereinbefore referred to has specifically, and in unmistakable language, provided against such a possible interpretation of the law.

The general principle was stated by Judge Treat in the Eighth Federal Judicial Circuit in the case of Blair v. St. Louis, H. & K. R. Co., 22 F. 36, 38, where the court observed, as we do here, that under a fair construction of the terms of the conveyance under the statute plaintiffs' demand was assumed as a liability by the defendant as the successor of the Alturas State Bank. "But, if not so," as the court said in that case, "the general principle must control, viz. that a grantee of corporate assets, as in this case, takes cum onere."

The same principle is stated by the Supreme Court of Oregon in Williams v. Commercial National Bank, 49 Or. 492, 500, 90 P. 1012, 1015 (11 L. R. A. [N. S.] 857), where the court says: "Where a corporation transfers all its assets to another corporation with a view of going out of business, and nothing is left with which to pay its debts, such transferee is charged with notice by the very circumstances of the transaction, and takes the same cum onere."

The same principle was followed as a guiding rule by the Supreme Court of Arizona in Valley Bank v. Malcolm, 23 Ariz. 395, 204 P. 207, 212.

[4] We are of the opinion that the defendant bank succeeded to the liability of the Alturas State Bank under the law of the state and the terms of the agreement of transfer. What was that liability? The agreement of May 27, 1922, between Carter, Rea, and the Alturas State Bank, provided that the Alturas State Bank guaranteed to Rea the fulfillment of the agreement by Carter to the extent of the failure by Carter to deliver to Rea the lambs provided for in the agreement. The defendant contends that this agreement was ultra vires. It appears that the agreement was made by the bank with a depositor in the ordinary transaction of its business affairs.

In Bates v. Coronado Beach Co., 109 Cal. 160, 163, 41 P. 855, 856, the court said: "Whether a contract is 'essential' to the transaction of its ordinary affairs, or for the purposes of the corporation, is to be determined by the corporation, or those to whom the management of its affairs is intrusted. If it is within the apparent scope of its organization, the fact that the contract has been entered into by it, or by its representative, is a determination on the part of the corporation that it is essential, and the corporation will not be permitted thereafter to question its effect."

[5] The evidence shows that, when the agreement of guaranty was made in this case by the Alturas State Bank, the bank had already advanced to Carter, a depositor, the money required to make the first or initial payments. This evidence was admitted by the court over the objection of the defendant that the effect of such evidence was to vary the terms of a written contract. We do not so understand it. The evidence was admissible as showing the subject-matter of the contract and the surrounding circumstances.

"It is a fundamental rule that in the construction of contracts the courts may look, not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made." Merriam v. United States, 107 U. S. 437, 441, 2 S. Ct. 536, 540 (27 L. Ed. 531), citing Nash v. Towne, 5 Wall. 689, 18 L. Ed. 527; Barreda v. Silsbee, 21 How. 146, 161, 16 L. Ed. 86; Shore v. Wilson, 9 Cl. & Fin. 355, 555; McDonald v. Longbottom, 1 El. & El. 977; Munford v. Gething, 29 L. J. C. P. 110; Carr v.

Montefiore, 5 B. & S. 407; Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622.

The bank having already made the advance to a depositor, it was manifestly for the interest of the bank as a business transaction, and in the conduct of its affairs, to secure reimbursement, if possible, and to do this it was presumably deemed advantageous to place itself behind Carter in the transaction. In other words, the agreement of guaranty, so far as appears in this record, was made by the bank in good faith and as incident to the transaction of its ordinary affairs and for its own benefit.

Carter, having failed to perform his terms of the contract, the Alturas State Bank suffered a loss, which has passed under the statute to the defendant; but this does not affect the result.

In Armour & Co. v. R. Rosenberg & Sons Co., 36 Cal. App. 773, 777, 173 P. 404, 405, the California District Court of Appeal had this to say concerning such a result: "Nor does the fact, as suggested by counsel for respondent, that the arrangement did not prove profitable, affect the power. The right is not dependent upon, nor is it in any manner impaired by, the fact that the welfare of the corporation was not promoted by the transaction. The power existing, the result of its exercise becomes unimportant."

The plaintiffs dealt with the bank under the implied representation that it was acting within its power in making the agreement of guaranty.

In the case of James Eva Estate v. Oakland B. & M. Co., 40 Cal. App. 515, 518, 181 P. 415, 416, it was held by the District Court of Appeals that: "When the act is within the corporate powers for some purposes or under some conditions, the rights of parties who have dealt with the corporation, under the express or implied representation that it is acting within such powers in the making of a particular contract are entitled to favorable consideration. In such a case the defense of ultra vires is not available unless it be shown that the party dealing with the corporation had notice of the intention to perform the act for an unauthorized purpose, or under circumstances not justifying its performance. * * * The attempt of a corporation to use the defense of ultra vires as a means of escaping its liability to third parties is regarded with much less favor than when a direct attack upon such corporate act is made by a stockholder or by the state."

In Woods Lumber Co. v. Moore, 183 Cal. 497, 501, 191 P. 905, 907 (11 A. L. R. 549),

the Supreme Court, in dealing with a contract of guaranty, said: "A corporation engaged in carrying on a business which it is authorized to do by its articles and the law under which it is organized has implied power to make all contracts which are 'essential to the successful prosecution of the business,' * ∴ ∵ or the making of which is an appropriate means by which it may be 'reasonably expected that the business in which the corporation is engaged will be advanced,' ∵ ∵ * or which are 'necessary and helpful to the conduct of its authorized business,' ∴ ∴ ∵ or which tends directly to promote the business authorized by its articles and which it is doing."

This doctrine is supported by numerous cases in the state of California, and by the following cases cited by the court below: Creditors' Claim & Adjustment Co. v. Northwestern Loan & Trust Co., 81 Wash. 247, 142 P. 670; Farmers' & Merchants' National Bank v. Illinois National Bank, 146 Ill. App. 136; People's Bank v. National Bank, 101 U. S. 181, 25 L. Ed. 907; Mott Iron Works v. Kaiser Co. (S. C.) 103 S. E. 783; First National Bank of Aiken v. Mott Iron Works, 258 U. S. 240, 42 S. Ct. 286, 66 L. Ed. 593.

We find no error in the record. The judgment of the District Court is accordingly affirmed.